John MACKEY et al., Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, an
unincorporated Association, et al.,
Defendants.

No. 4–72–Civil 277.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 29, 1975.

Edward M. Glennon, Lindquist & Vennum, Minneapolis, Minn., for plaintiffs.

Irving R. Brand, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for 26 NFL Member Clubs; James C. McKay and Paul J. Tagliabue, Covington & Burling, Washington, D. C., of counsel.

John D. French, Faegre & Benson, Minneapolis, Minn., for NFL and Pete Rozelle.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

LARSON, District Judge.

### INTRODUCTION

Trial commenced before the Court without a jury on February 3, 1975, and terminated on July 19, 1975, after 55 days of trial. Sixty-three witnesses presented oral testimony in the Court Room and the testimony of four of these witnesses was also presented by deposition transcript. Five additional witnesses testified solely through deposition transcript. The Court's attention was directed to in excess of 400 exhibits. The trial transcript extends to over 11,000 pages. Post-trial briefs were received by October 1, 1975.

The plaintiffs are present or former professional football players in the National Football League (hereinafter "NFL"). The Count I plaintiffs seek only injunctive relief. They are Kermit Alexander, Kenneth Bowman, William Curry, Thomas Keating, John Mackey and Alan Page. The Count II plaintiffs seek monetary damages. They are Ocie Austin, Marlin Briscoe, Richard F. Gordon, John Henderson, Clint Jones, Gene Washington, Charles West, John Williams and Nate Wright.

The NFL is an unincorporated association or league of professional football clubs. Its membership presently consists of 26 professional football clubs, each operating a team within the United States. The NFL schedules and organizes the pattern of games played between the teams of its member clubs. The league provides officials for the supervision of the playing of such games and has formulated rules for the playing of such games. The NFL performs various other functions related to the operation of a professional sports league. Defendant Alvin Ray "Pete" Rozelle is an employee of the NFL, is its chief executive officer and its commissioner. His powers and duties are set forth in the NFL Constitution and By-Laws. Defendant clubs own and operate professional football teams and each club is a member club of the NFL. The business of professional football as conducted by them involves a variety of activities, including the playing of football games, transporting players and other team personnel, employing players and other personnel, purchasing and transporting equipment, and arranging telecasts and broadcasts of professional football games through contracts with television and radio networks or stations. Defendants have admitted for purposes of this proceeding that each of them transacts business in the District of Minnesota.

On October 11, 1972, plaintiffs filed their Amended Complaint, which added Richard F. Gordon and Ocie Austin as parties plaintiff. On January 10, 1974, plaintiffs filed their Second Amended Complaint, which deleted the class action allegations contained in the original and amended complaints.

The Court's pretrial understanding of the issues to be tried was as follows:

(1) Plaintiffs claim that Section 12.-1(H) of the NFL Constitution and By-Laws (hereinafter referred to as the "Rozelle Rule") constitutes a *per se* violation of the antitrust laws. Plaintiffs claim that if the Rozelle Rule does not constitute a *per se* violation of the antitrust laws, it violates the Rule of Reason standard. Plaintiffs further claim that they are entitled to damages and injunctive relief.

(2) Defendants claim that the *per se* standard is not applicable, that the Rule of Reason standard is the test to be applied, and that under that test

there is no violation of the antitrust laws. Defendants further claim that their conduct is immune from the antitrust attack under their "labor exemption" defense. Defendants further claim that this action is not properly in this Court, but rather is within the exclusive jurisdiction of the National Labor Relations Board.

Pursuant to pretrial Order on December 6, 1974, trial was held on the issues of liability of defendants under the antitrust laws. Pending determination of the issues of antitrust liability, trial as to the damage issues was deferred. At the close of plaintiffs' case defendants' motion to dismiss was denied.

Extensive evidence as to the reasonableness of the Rozelle Rule under the Rule of Reason standard was received during the course of the trial.

The trial afforded the Court a comprehensive view of the workings of the National Football League and of the collective bargaining history and of the nature and effects of the Rozelle Rule.

The Court was aided by financial exhibits produced by defendants, expert testimony by economists, and testimony by owners, players, coaches, general managers, and others.

The Court's Findings of Fact and Conclusions of Law are set forth in 10 numbered topics hereafter.

In reaching these Findings the Court has weighed the evidence relating to the restrictive and anticompetitive nature of the Rozelle Rule against the evidence presented by defendants to show among other things:

(1) That the Rozelle Rule is reasonable.

(2) That the NFL member clubs are not horizontal business competitors of one another.

(3) That professional football is a form of entertainment dependent on competitive balance.

(4) That the Rozelle Rule is necessary to maintain such competitive balance.

(5) That the Rozelle Rule and other player rules have served player and club interests.

(6) That the Rozelle Rule is absolutely necessary to the existence of professional football and the structure of the game.

The Findings which follow therefore constitute the Court's decision in compliance with Rule 52 of the Rules of Civil Procedure.

## 1. DEFENDANT NFL AND ITS MEMBER CLUBS ARE SUBJECT TO THE ANTITRUST LAWS.

1.1 The business of professional football is subject to the antitrust laws. *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

1.2 Each of the NFL member club defendants and the NFL is engaged in interstate commerce to a substantial degree.

1.3 The defendant member clubs are organized and operated for profit.

1.4 Defendant NFL and its member clubs have a complete monopoly over major league professional football in the United States.

## 2. THE HISTORY OF THE ROZELLE RULE.

2.1 Prior to 1963 there was no right in any club to receive compensation from another club when that club signed a player who had previously been under contract to the first club.

2.2 In 1962, R. C. Owens became a free agent after playing out the option year with the San Francisco 49ers, and was no longer under contract to that or any other club. Owens then signed a contract with the Baltimore Colts. The adoption of the Rozelle Rule followed the signing of Owens.

2.3 The Rozelle Rule was unilaterally adopted by defendant member clubs in 1963 as an amendment to their Constitution and By-Laws, becoming Section 12.-1(H) of that document.

2.4 Article 12.1(H) of the NFL Constitution and By-Laws (hereinafter the "Rozelle Rule") reads as follows:

"Any player, whose contract with a League club has expired, shall thereupon become a free agent and shall no longer be considered a member of the team of that club following the expiration date of such contract. Whenever a player, becoming a free agent in such manner, thereafter signs a contract with a different club in the League, then, unless mutually satisfactory arrangements have been concluded between the two League clubs, the Commissioner may name and then award to the former club one or more players, from the Active, Reserve, or Selection List (including future selection choices) of the acquiring club as the Commissioner in his sole discretion deems fair and equitable; any such decision by the Commissioner shall be final and conclusive."

2.5 The Rozelle Rule has continued to the present day as Section 12.1(H) of the NFL Constitution and By-Laws without any change from the form in which it was originally adopted.

2.6 Each of the member clubs, as a condition of its initial entry into the National Football League, agreed to abide by the NFL Constitution and By-Laws. Each of the defendant NFL member clubs has thus agreed to be bound by and to follow the Rozelle Rule.

2.7 Through the conclusion of trial Commissioner Rozelle had exercised his power under the Rozelle Rule of awarding compensation to the club to which a player had previously been under contract four times. Those instances were as follows:

2.7.1 *Pat Fischer*—In 1967 Fischer played out the option year with the St. Louis Cardinals. After May 1, 1968, he was signed by the Washington Redskins. Commissioner Rozelle awarded the Cardinals a second round draft choice in the 1969 draft and a third round draft choice in the 1970 draft.

2.7.2 *David Parks—Kevin Hardy*—In 1967 Parks played out the option with the San Francisco 49ers and became a free agent on May 1, 1968. He subsequently signed a contract with the New Orleans Saints. There had been no agreement on compensation between the two clubs. Commissioner Rozelle awarded as compensation from the New Orleans Saints to the San Francisco 49ers Hardy, the New Orleans Saints' first round draft choice in the earlier 1968 draft, and the New Orleans Saints' first round draft choice in the upcoming 1969 draft.

2.7.3 *Phil Olsen*—In 1971 the New England Patriots neglected to timely exercise their option over Olsen's services for the upcoming 1972 season. Commissioner Rozelle declared Olsen a free agent and no longer a member of the New England Patriots team. Olsen then signed with the Los Angeles Rams. Commissioner Rozelle awarded to the New England Patriots the Los Angeles Rams' first round draft choice in the 1972 draft and stated that additional compensation would be awarded to the Patriots from the Rams at the conclusion of the 1971 season. He also directed the Rams to pay to the Patriots the sum of $35,000 constituting Olsen's initial signing bonus and other expenses. In January 1972 Commissioner Rozelle awarded additional compensation to the New England Patriots: the Rams' third round draft choice which they had previously acquired from the Washington Redskins.

2.7.4 *Dick Gordon*—Gordon played out the option with the Chicago Bears during the 1971 season and became a free agent May 1, 1972. A number of clubs thereafter expressed interest in obtaining Gordon's services. However, no club was able to work out a compensation agreement with the Chicago Bears. Because of this fact, no club would sign Gordon due to the unknown compensation that would be awarded should it do so. The situation was at an impasse well into the 1972 regular season. Finally, Commissioner Rozelle announced in advance of any signing what the compensation to the Chicago Bears would be: a first round draft choice for the draft

following the 1973 football season. Immediately thereafter the Los Angeles Rams signed Gordon to a contract.

### 3. OTHER CLAIMED ANTICOMPETITIVE PRACTICES OF THE DEFENDANTS.

3.1 A better understanding of the Rozelle Rule requires analysis of other anticompetitive rules and practices of the defendants. These rules, part of the reserve system of the NFL, impose severe hardships on a player prior to his ever becoming a free agent and act to discourage and deter players from playing out the option and achieving that status.

3.2 *The Draft*—The player selection process of the defendants, commonly referred to as the Draft, occurs annually in January or February.

3.2.1 Virtually all players desiring to enter into professional football, and deemed qualified, are divided up by defendants among the defendant clubs. Each such player is required to negotiate and deal with only that one defendant club to whom he has been assigned. The draft deprives players of the opportunity to negotiate with clubs other than the one club that drafted them.

3.2.2 If the player does not desire to deal with the defendant club which selected him or if he is unwilling to accept the terms offered by it, he is effectively boycotted or blacklisted.

3.3 *Standard Player Contract*—If a player is drafted and agrees to the terms of the defendant club to which he is thereby assigned, the rules of the NFL dictate that he sign a Standard Player Contract.

3.3.1 No club is allowed to employ a player who will not sign this form of contract. (Section 15.6 of the NFL Constitution and By-Laws.)

3.3.2 While minor modifications or departures from the Standard Player Contract are permitted by defendants, no modifications or departures are permitted that would open up a player's services to free competition between the clubs. The Standard Player's Contract in all cases binds each player to a member club for a period of at least two years. The two year period is comprised of the stated period of duration of the contract—one year, and a second year mandated by a provision granting the club a unilateral right to extend the contract for that period.

3.4 *Option Clause*—This provision in the Standard Players Contract allows the club to unilaterally extend the player's contract for an additional year, and is referred to as the Option Clause.

3.4.1 The Option Clause acts to discourage players from playing out the option and becoming free agents.

3.4.2 It binds the player to an additional year during which he must perform for the club.

3.4.3 Further, under the Option Clause a club can, and in virtually all cases does, reduce the player's salary to 90% of the contract amount for the previous year.

3.4.4 In most instances the player would prefer to sign a new contract with his club at the new salary offered him than play an additional year at a 10% reduction in salary.

3.4.5 During this option year the player who has not signed a new contract faces possible informal discipline by disapproving coaches and owners. He also risks injury and a poor performance during the option year, facts which would substantially limit his opportunities to go elsewhere if and when he attained free agent status.

3.5 *Tampering*—Competition for players' services is further frustrated by the so-called tampering rule. During the time a player is under contract with one club, including the option year, all defendant clubs are prohibited from negotiating with him or making offers to him. This prohibition runs to May 1, despite the fact that the clubs' regular season ends in the previous December. Such negotiations or offers are called tampering, which, under Section 9.2 of the NFL Constitution and By-Laws, subjects the offending club to fines, penal-

ties and liability to expulsion from the League.

3.5.1 The player has thus an unnecessarily small amount of time in which to bargain with other clubs if and when he finally achieves free agent status. That time period is, for all practical purposes, less than three months in length: from May 1 to the beginning of the summer camps of the clubs.

## 4. THE RESERVE SYSTEM OF THE NFL.

4.1 At the end of the option year, which ends on May 1, a player theoretically gains his freedom and may bargain with any club. Such freedom appears to be illusory.

4.2 A club which desires a player who has played out the option and has become a "free agent" cannot sign that player without an agreement in advance as to what compensation it will pay to the club to which the player was formerly under contract, unless it is willing to risk an unknown compensation award by Commissioner Rozelle.

4.3 The fact that unknown compensation would be awarded has acted as an effective deterrent to clubs signing free agents without reaching a prior agreement on compensation with that player's former club.

4.3.1 The extreme reluctance of clubs to sign such a player without a prior agreement on compensation is clearly evidenced by the few isolated instances in which it has occurred since the adoption of the Rozelle Rule in 1963.

4.3.2 Numerous witnesses have testified that the Rozelle Rule has a chilling effect on negotiations between free agents who have played out the option and other clubs.

4.4 The compensation that has been awarded in the four Commissioner's awards that have occurred, especially that of Dave Parks, has acted as an effective deterrent to clubs signing free agents without reaching a prior agreement on compensation with that player's former club.

4.5 Consequently, if the club to which the "free agent" was formerly under contract is unable or unwilling to work out a compensation agreement with another club, the player has the choice of re-signing with his former club or not playing football.

4.6 The Rozelle Rule restricts the number of clubs that will be interested in such a player. The club must have trading material agreeable to both clubs. It is not simply a matter of needing the player's services and agreeing on contractual terms with him. The requirement that compensation be given has been an effective deterrent to clubs signing free agents.

4.7 The transaction under which a player who has become a free agent by playing out the option succeeds in signing with another club is, in effect, a trade. The acquiring club in all cases must give compensation to the player's former club. The player's former club, even though it no longer has any contractual rights to the player, in fact does have the rights to the player by reason of the Rozelle Rule, and can and does demand and receive equal compensation for him.

4.8 Because of the Rozelle Rule, a player who has played out the option and becomes a free agent is not free to bargain with any other club. The club to which he was formerly under contract still controls his ability to participate in football, even though there is no longer any contractual obligation whatsoever.

4.9 The effect is substantially identical to the lifetime reserve system in professional baseball, except for the three isolated instances in which a player has signed with another team without compensation having been determined in advance.

4.10 The knowledge of a player that the club he is now under contract with may be unwilling or unable to consummate a trade for his services upon his playing out the option and becoming a free agent, acts as a substantial deterrent to players playing out the option and becoming free agents. The player

knows that because of the Rozelle Rule he probably will have no choice but to return to the defendant club to which he has already announced his intention to leave.

4.11 The Rozelle Rule substantially restricts players' freedom of movement.

4.12 The existence of the Rozelle Rule substantially decreases players' bargaining power in contract negotiations.

4.12.1 The players are not free to quit and obtain employment elsewhere with another NFL club.

4.12.2 Under the Rozelle Rule each individual player is denied the right to sell his services in a free and open market.

4.12.3 As a result, the salaries paid by each club are lower than if competitive bidding were allowed to prevail.

4.13 Absent the Rozelle Rule there would be increased movement in interstate commerce of players from one club to another.

4.14 The Rozelle Rule is an all encompassing web that restrains a wide variety of aspects of players' lives.

4.15 The NFL and each club unlawfully benefit from the existence of the Rozelle Rule.

## 5. CONCLUSIONS OF LAW.

5.1 The Rozelle Rule constitutes a *per se* violation of the antitrust laws.

5.1.1 The Rozelle Rule and its related practices constitute a concerted refusal to deal and a group boycott on the part of defendants.

5.1.2 These are practices which the courts have long held to be *per se* violations of the Sherman Act. *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Klor's, Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *United States v. General Motors Corp.*, 384 U.S. 127, 145–147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

5.2 The Rozelle Rule is so clearly contrary to public policy that it is *per se* illegal under the Sherman Act. It is also an unreasonable restraint of trade at common law.

## 6. RULE OF REASON STANDARD.

6.1 The Court has specifically found that the Rozelle Rule constitutes a *per se* violation of the antitrust laws. Considerable evidence which related to the reasonableness of the Rozelle Rule under the antitrust laws was offered and received over objection.

6.2 The Rozelle Rule is invalid under the Rule of Reason standard.

6.2.1 The Rozelle Rule is unreasonably broad in its application. The testimony indicated that defendants are concerned with the effects of unrestricted movement between clubs of the best players in the NFL. Little or no concern was expressed with respect to the average or below average player playing out the option and going to another club without any compensation being given or awarded. However, the Rozelle Rule is not limited to superstars or even the better players. It covers, includes and affects every player, no matter how marginal his status or ability.

6.2.2 The rule is further unreasonable in that there are no procedural safeguards whatsoever with respect to its employment. There is no hearing or opportunity to be heard. The free agent player may not even be aware that other clubs are interested in him and are negotiating with the club to which he was formerly under contract. There is no safeguard against the club to which the player was formerly under contract being unreasonable or refusing to even state any compensation demand. A club can and often does effectively discourage interest by other clubs in a free agent player simply by telling them that they are interested in signing the player and that they intend to do so.

6.2.3 The Rozelle Rule is unreasonable in that it is unlimited in duration. It is a perpetual restriction on a player, following him throughout his career. He is at no time truly free to negotiate for his services with any NFL club.

6.2.4 The Rule is unreasonable when viewed in conjunction with the other anticompetitive practices of defendants: the Draft; the Standard Player Contract; the Option; the Tampering Rule.

6.3 The justifications as to reasonableness presented by defendants fail to demonstrate that the Rule is reasonable.

■ 6.3.1 Protection of Investment—Defendants claim that one of the purposes of the Rozelle Rule is to protect the member clubs' investment in established players: e. g., scouting expenses and player development costs. The Court finds that the expense incurred in selection, training and development of professional football players is not unlike that of other businesses which incur hiring and training costs. There is no right to compensation for this type of investment.

6.3.2 Player Continuity—Evidence was presented by defendants that player continuity was important to the success of a football team. Testimony was presented that time was required for payers to effectively work together as a team.

6.3.2.1 The elimination of the Rozelle Rule would, however, affect all teams equally.

■ 6.3.2.2 The quality of play in the NFL will not decrease with the elimination of the Rozelle Rule and consequent freedom of employment. Even assuming the quality of play would decrease, that fact does not justify the Rule's anticompetitive nature.

6.3.2.3 The player continuity argument implicitly acknowledges that the Rozelle Rule restricts player movement and that there would be additional movement if it was eliminated.

6.3.2.4 One of the purposes of the Rozelle Rule is to restrict player movement.

6.3.3. Competitive Balance—The Court finds that the existence of the Rozelle Rule and the other restrictive devices on players have not had any material effect on competitive balance in the National Football League. Assuming that they have fostered competitive bal-

ance, other legal means are available to pursue this goal (e. g., the Competition Committee, multiple year contracts and special incentives).

6.3.4 Disruption of and Irreparable Damage to the NFL—Elimination of the Rozelle Rule would have no significant immediate disruptive effect on professional football.

6.3.4.1 All players are now under contract to a club, some under long, multiple year contracts.

6.3.4.2 Relatively few players at a given time are playing in the option year.

6.3.4.3 Elimination of the Rozelle Rule will not spell the end of the National Football League or even cause a decrease in the number of franchises in the National Football League.

6.3.4.4 Changes in location of franchises or reorganization of existing franchises may occur.

6.3.4.5 If the effects of this decision prove to be too damaging to professional football, assuming justification existed, Congress could possibly grant special treatment to the National Football League based upon its claimed unique status.

## 7. DEFENDANTS' CLAIMED LABOR EXEMPTION.

■ 7.1 There is no labor exemption from the antitrust laws available to defendants.

■ 7.2 The exemption extends only to labor or union activities, and not to the activities of employers.

7.3 Assuming the labor exemption can extend derivatively or otherwise to management, it cannot be so extended under the facts in this case.

■ 7.4 The product in professional football for antitrust analysis consists of the players. The Rozelle Rule operates as a direct restriction on competition in this product market.

7.5 The Rozelle Rule is not, and has not been considered by the union to be, in the players' best interests.

7.6 The Rozelle Rule is a nonmandatory, illegal subject of bargaining.

■ 7.6.1 The Rozelle Rule, being a *per se* violation of the antitrust laws and otherwise violative of the antitrust laws under the Rule of Reason standard, cannot, because of its illegality, constitute a mandatory subject of bargaining as that phrase is used in labor law.

■ 7.6.2 Mandatory bargaining under the National Labor Relations Act does not coincide with legality under the Sherman Act. The National Labor Relations Act governs the methods or procedures for reaching a collective bargaining agreement, not the legality of it.

■ 7.6.3 Simply because the clubs and the union must bargain does not mean that the clubs can ignore other laws. *United Mine Workers v. Pennington*, 381 U.S. 657, 665, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

7.7 In neither of the two collective bargaining sessions which resulted in collective bargaining agreements was there any trade-off or quid pro quo whereby the union agreed to the Rozelle Rule in return for other benefits.

7.7.1 Individual negotiation of regular season salaries is traditional in professional sports.

7.7.2 In 1968 and again in 1970 neither party in the collective bargaining wanted any change from this traditional practice.

7.7.3 Prior to the commencement of negotiations in 1968 it was agreed that the union would not be required to negotiate regular season salaries.

7.8 The union has never agreed to the Rozelle Rule.

7.9 In the collective bargaining history between the union and the defendants there has been nothing which could be legitimately characterized as "bargaining" between the parties with respect to the Rozelle Rule.

7.9.1 In the 1968 negotiations there was from the outset a solid refusal on the part of the owners to negotiate on the Option Clause, which term at that time was understood to include the Rozelle Rule.

7.9.2 The Option Clause issue was effectively ignored by relegating it to a committee for "study" under the 1968 NFLPA–NFL Collective Bargaining Agreement. (Article VIII.)

7.9.3 There was no agreement by the union to the Rozelle Rule in the 1968 Collective Bargaining Agreement.

7.9.4 The union achieved little in the way of substantive benefits in the 1968 Collective Bargaining Agreement.

7.9.4.1 Most of the substantive benefits to the union were in reality continuation of past practices by the defendants.

7.9.5 There was no agreement by the union to the Rozelle Rule in the 1970 Collective Bargaining Agreement.

7.9.6 In 1970 the position of the clubs, expressed numerous times to the union leaders, was that there could be no changes in the "structure of the game or in the Commissioner's form of self government." Defendants took the position throughout the 1970 negotiations that the Commissioner's powers, including the Rozelle Rule, could not be touched and were non-negotiable. Throughout the 1970 bargaining process there was no negotiation during which the union agreed to or accepted the Rozelle Rule.

7.9.6.1 The Scope of Agreement clause in the 1970 Collective Bargaining Agreement does not constitute an acceptance by the union of the Rozelle Rule.

7.9.6.2 There is no reference in the Rozelle Rule in the 1970 NFLPA–NFL Collective Bargaining Agreement.

7.9.6.3 The clubs sought to insert a provision dealing with the Rozelle Rule during the drafting of the 1970 Collective Bargaining Agreement.

7.9.6.4 The clubs through this provision were attempting to protect themselves from litigation attacking the Rozelle Rule.

7.9.6.5 The union rejected this provision.

7.9.7 The 1970 Collective Bargaining Agreement expired by its terms January 31, 1974. Since that time there has been no collective bargaining agreement in effect between the NFLPA and the clubs.

7.9.8 In the 1974 negotiations the union demanded the elimination of the Rozelle Rule, taking the position that in their judgment it was illegal. This latter position was the position of the NFLPA throughout the negotiations in 1974.

7.9.9 There were no negotiations on any major issues in 1974.

7.10 The union, from its inception through the present day, has been too weak vis-a-vis the clubs to obtain elimination of or even a reasonable modification of the Rozelle Rule.

7.10.1 In 1968 the split between the leaders of the AFLPA and the NFLPA contributed to a severely weak bargaining position on the part of the union.

7.10.2 In 1968 the union was a fledgling organization and had its first experience with formal collective bargaining and this further contributed to a weak bargaining position.

7.10.3 Faced with the clubs' refusal to even discuss the issue in 1968, union representatives realistically had no hope of eliminating the Rozelle Rule or even changing it.

7.10.4 In 1968 the American Football League Players Association's signing of a collective bargaining agreement with the clubs undercut the brief strike of the NFLPA and left the NFLPA no alternative but to accede to the clubs' terms.

7.10.5 Factors contributing to the relatively weak position of the union in collective bargaining with the clubs in 1970 were inadequate finances and communication problems, the latter made particularly acute by the large number of players and their geographical dispersion.

7.10.5.1 The union was approximately $200,000 in debt during the 1974 negotiations. That was also the union's financial position at the conclusion of trial.

7.10.5.2 There exists a great disparity in financial strength between the clubs'

collective bargaining committee and the union.

7.10.6 Illustrative of the lack of bargaining power of the union and the strength of the clubs was the reduction by the clubs in 1975 in the squad size from 47 active players to 43. This reduction was unilaterally imposed by the clubs without any bargaining or consultation with the union.

7.10.7 It has been impossible to date for the union to wage an effective strike in support of their bargaining demands.

7.10.7.1 A strike has never been economically feasible for the union.

7.10.7.2 An effective strike has never been possible for the union partly as a result of the substantial adverse public pressure that would be engendered by the taking of such action.

7.11 The present litigation should not have impeded or frustrated the collective bargaining efforts of the parties. Any such impeding or frustrating effect has been the result of the defendant clubs' insistence on an agreement by the union to the present Rozelle Rule or to a provision substantially similar in effect.

7.12 The Rozelle Rule has never been the subject of serious, intensive, arms-length collective bargaining.

7.13 The Rozelle Rule was unilaterally imposed by the NFL and member club defendants upon the players in 1963 and has been imposed on the players from 1963 through the present date.

7.14 The NFLPA has made every effort to eliminate the Rozelle Rule, but in that endeavor has been totally unsuccessful.

7.15 From 1963 up until 1968 the defendants operated independent of collective bargaining constraints.

7.16 Defendants are not insulated from antitrust liability simply because of the emergence of collective bargaining with the union in 1968 and the union's inability to date to achieve the elimination of the Rozelle Rule through the collective bargaining process.

 

## 8. JURISDICTION OF THE NATIONAL LABOR RELATIONS BOARD.

8.1 The National Labor Relations Board does not have exclusive jurisdiction over the subject matter of this lawsuit.

8.2 The National Labor Relations Board does not have primary jurisdiction over issues necessary to the Court's determination.

8.2.1 The doctrine of exclusive primary National Labor Relations Board jurisdiction has never been applied by the Supreme Court to avoid a determination on the merits of an antitrust claim.

## 9. DAMAGES.

9.1 The Court finds that each of the plaintiffs has been injured in his business or property.

9.2 Evidence as to the specific damages suffered by each of the nine Count II plaintiffs within the limitation period will be heard in that stage of the trial relating to the damage issues.

## 10. ORDER FOR JUDGMENT.

10.1 The Clerk shall enter judgment on these Findings and Conclusions as follows:

10.2 Section 12.1(H) of the NFL Constitution and By-Laws, commonly referred to as the Rozelle Rule, is hereby declared to be in violation of the antitrust laws.

10.3 Defendants, and each of them, their respective officers, agents, servants, employees, and all persons in active concert or participation with them, or any of them who receives actual notice of this judgment by personal service or otherwise, be, and they hereby are, permanently restrained and enjoined, pending further order, from continuing, attempting to continue, or otherwise enforcing the Rozelle Rule against plaintiffs.

10.4 For the plaintiffs and against defendants on Counts I and II of plaintiffs' Second Amended Complaint.

10.5 Costs and attorneys' fees will be determined later.

10.6 Judgment will be stayed pending appeal or until further Order of this Court.