[L.A. No 31560. Aug. 29, 1983.]

DENNIS PARTEE, Plaintiff and Respondent, v.
SAN DIEGO CHARGERS FOOTBALL COMPANY,
Defendant and Appellant.

## Counsel

Terry Christensen, Andrew M. White, Michael E. Viebrock and Wyman, Bautzer, Rothman, Kuchel & Silbert for Defendant and Appellant.

Hamilton Carothers, Keith A. Teel and Covington & Burling as Amici Curiae on behalf of Defendant and Appellant.

Louis E. Goebel, Brian D. Monaghan, James E. Rubnitz and Goebel & Monaghan for Plaintiff and Respondent.

## Opinion

**BROUSSARD, J.**—The San Diego Chargers Football Company, a California limited partnership, appeals a judgment awarding damages for violation of the California antitrust law. (Bus. & Prof. Code, § 16700 et seq., hereinafter the Cartwright Act.)[1] In accordance with other decisions considering the applicability of state antitrust laws to national professional sports leagues, we conclude that the Cartwright Act is not applicable to the interstate activities of professional football.

From 1968 to 1976, Dennis Partee, a California resident, played professional football as a punter and placekicker for the Chargers, a member of the National Football League (NFL). In 1974, the World Football League came into existence, and one of its teams offered Partee $50,000 to play for

---

[1] The judgment also awarded damages for breach of contract. On appeal, the Chargers did not challenge the part of the judgment awarding contract damages, and we dismissed the appeal insofar as it relates to that award.

it for a season. He subsequently entered into a contract with the Chargers for three years with a salary of $38,500 in 1974, $44,000 in 1975, and $49,500 in 1976. The agreement was subject to the terms and conditions of the standard NFL players contract. The trial court fixed damages for violation of the Cartwright Act based on the difference between the $50,000 offer and the 1974 salary, awarded for the three years of the contract and trebled for a total award of $103,500.

In 1975, the last full year Partee played for the Chargers, the NFL had 26 teams located in 16 states and the District of Columbia. The league structure is characterized by a basic division into two conferences each having divisions composed of certain teams within the conference, and by play according to an ordered schedule between teams within the various divisions and the two conferences. The Chargers play nearly half their games outside of California, and most of their games are against teams located in other states. NFL games are regularly broadcast coast to coast over network television, and professional football has gained nationwide appeal.

To promote athletic competition by providing a means of keeping the teams on a par with each other and to foster the business success of the member teams, the NFL has certain operating rules, many of which are embodied in the NFL constitution and bylaws. Partee's antitrust action concerns five of these operating rules as they existed in 1974: the draft, option clause, Rozelle rule, tampering rule and one-man rule.[2] These rules are applied nationwide to all of the teams in the league. The court found all but the option clause to violate California antitrust laws.

Since 1968, all NFL players have been represented by the NFL Players Association (NFLPA). In 1970, the NFLPA and NFL management entered

---

[2]The draft is a selection system whereby the respective NFL teams are awarded the initial rights to negotiate exclusively with football players graduating from college.

The option clause is a provision of the NFL Standard Player Contract which grants the team the right to renew a player's contract for one additional year if the team and player cannot agree to a new contract. After the option year expires, the player becomes a "free agent" and may negotiate and contract with teams of another league or with other NFL teams subject to the Rozelle rule.

The Rozelle rule is named after the NFL commissioner, Pete Rozelle. This rule provides if a free agent contracts with another NFL team, the new team must compensate the player's former team with draft choice(s) or other player contracts. If the new and former teams cannot agree as to the compensation, the commissioner arbitrates the matter and determines the compensation.

The tampering rule prohibits an NFL team from negotiating with a player currently under contract with another NFL team. Also, if one team has the exclusive right to negotiate with a player, no other team may tamper with that player.

The one-man rule refers to the commissioner's authority to compel a player to adhere to terms of an operative collective bargaining agreement between the players and the NFL teams.

a second collective bargaining agreement covering the 1970 and 1973 seasons. No new agreement was reached until March 1977, but this agreement was made retroactive to the expiration date of the prior agreement. This new agreement, which was effective into 1982, contains each of the rules or practices challenged by Partee.[3]

■ The Chargers contend that professional football is a unique activity of interstate commerce which requires nationally uniform governance, that only federal antitrust laws apply, that interstate commerce would be unreasonably burdened if state antitrust laws were applied to professional football's interstate activities, and that application of the Cartwright Act was a violation of the commerce and supremacy clauses of the Constitution.

■ The Chargers do not claim federal antitrust laws, the Sherman and Clayton Acts, "occupy" the field of antitrust regulation, or that the federal and state antitrust laws so conflict as to require preemption of the state scheme. The federal and California antitrust laws, having identical objectives, are harmonious with each other. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].)

■ The commerce clause is a limitation upon the power of the states without implementing legislation by Congress. (*A.&P. Tea Co., Inc.* v. *Cottrell* (1976) 424 U.S. 366, 370-371 [47 L.Ed.2d 55, 60, 96 S.Ct. 923].) "Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" (*Edgar* v. *Mite Corp.* (1982) 457 U.S. 624, 640 [73 L.Ed.2d 269, 282, 102 S.Ct. 2629, 2640]; *Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 471 [66 L.Ed.2d 659, 673, 101 S.Ct. 715]; *Pike* v. *Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178, 90 S.Ct. 844].) The burden on interstate commerce will ordinarily be found unreasonable where the state regulation substantially impedes the free flow of commerce from state to state or governs "those phases of the national commerce which, because of the need of national uniformity, demand their

---

[3]This second collective bargaining agreement was negotiated during the pendency of antitrust suits brought by players against the NFL. The most significant case, *Alexander* v. *National Football League* (D.Minn. 1977) 1977-2 Trade Cases (CCH) ¶ 61,730, was a class action. The agreement and *Alexander* incorporate a settlement which includes the practices and rules Partee challenges. The settlement also contains a covenant not to sue (in antitrust) by the class members. However, Partee, who filed this suit before the specified cutoff date, chose not to be a class member. This agreement terminated in mid-1982.

regulation, if any, be prescribed by a single authority." (*Southern Pacific Co.* v. *Arizona* (1945) 325 U.S. 761, 767 [89 L.Ed. 1915, 1923, 65 S.Ct. 1515].) The commerce clause permits only incidental regulation of interstate commerce by the states; direct regulation is prohibited. (*Edgar* v. *Mite Corp.*, *supra*, 457 U.S. 624, 641-643 [73 L.Ed.2d 269, 282-283, 102 S.Ct. 2629, 2640-2641].)

█ It is settled that the NFL is engaged in interstate commerce and that federal antitrust laws are applicable. (*Radovich* v. *Nat. Football League* (1957) 352 U.S. 445, 452 [1 L.Ed.2d 456, 462, 77 S.Ct. 390].)

█ A number of cases have considered the applicability of state antitrust laws to national professional sports leagues. The leading case is *Flood* v. *Kuhn* (S.D.N.Y. 1970) 316 F.Supp. 271, affirmed (2d Cir. 1971) 443 F.2d 264, affirmed 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099]. Considering baseball's reserve system, the trial court found state antitrust laws inapplicable on alternative grounds: preemption and unreasonable burden on interstate commerce.[4]

Treating the applicability of state antitrust laws to professional baseball as a question of first impression, the Second Circuit affirmed. (*Flood* v. *Kuhn*, *supra*, 443 F.2d 264, 267-268.) The court stated: "[W]here the nature of an enterprise is such that differing state regulation, although not conflicting, requires the enterprise to comply with the strictest standard of several states in order to continue an interstate business extending over many states, the extra-territorial effect which the application of a particular state law would exact constitutes, absent a strong state interest, an impermissible burden on interstate commerce." (*Id.*, at p. 267.)

Analyzing the organization of professional baseball and the effect of state antitrust regulation balanced against its need, the court of appeals reasoned: "Professional baseball clubs, although existing as separate legal entities, are organized into so-called leagues for competitive play and are dependent on the league playing schedule to further the ends of their sports competition. Therefore, it is the league structure at which any state antitrust regulation must be aimed if organized professional baseball is not to be severely fragmented. On the one hand, it is apparent that each league extends over

---

[4]As considered by the trial court in *Flood* v. *Kuhn*, baseball's reserve system had many of the attributes of the NFL rules and practices of which Partee complains. Baseball's reserve system involved an agreement by all of the teams to be involved in a draft creating exclusive bargaining rights in the club as to the draftee; a uniform player's contract empowering the signing club unilaterally to renew a player's contract from year to year; denial of any right in a player, once signed, to negotiate with any other team; a prescribed number of players per team; and the unilateral right of a team to assign the contract to another team. (See *Flood* v. *Kuhn*, *supra*, 316 F.Supp. 271, 273-275.)

many states, and that, if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard. The consequent extra-territorial effect of necessary compliance would be considerably more far-reaching than that in Southern Pacific Co. v. Arizona, *supra.* On the other hand, we do not find that a state's interest in antitrust regulation, when compared with its interest in health and safety regulation, is of particular urgency. Hence, as the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law." (443 F.2d at pp. 267-268; fn. omitted.)

Affirming the circuit court, the United States Supreme Court stated: "The petitioner's argument as to the application of state antitrust laws deserves a word. Judge Cooper rejected the state law claims because state antitrust regulation would conflict with federal policy and because national 'uniformity [is required] in any regulation of baseball and its reserve system.' 316 F.Supp., at 280. The Court of Appeals, in affirming, stated, '[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law.' 443 F.2d, at 268. As applied to organized baseball, and in the light of this Court's observations and holdings in *Federal Baseball,* in *Toolson,* in *Shubert,* in *International Boxing,* and in *Radovich,* and despite baseball's allegedly inconsistent position taken in the past with respect to the application of state law, these statements adequately dispose of the state law claims." (407 U.S. at pp. 284-285 [32 L.Ed.2d at p. 745], fn. omitted; see *State of Wisconsin* v. *Milwaukee Braves, Inc.* (1966) 31 Wis.2d 699 [144 N.W.2d 1, 17-18]; cert. den. 385 U.S. 990 [17 L.Ed.2d 451, 87 S.Ct. 598]; rehg. den. 385 U.S. 1044 [17 L.Ed.2d 689, 87 S.Ct. 770].)

Following *Flood* v. *Kuhn,* state antitrust regulation has been held inapplicable to professional basketball (*Robertson* v. *National Basketball Association* (S.D.N.Y. 1975) 389 F.Supp. 867, 881; *HMC Management* v. *New Orleans Basketball Club* (La.App. 1979) 375 So.2d 700, 706-707) and professional football (*Matuszak* v. *Houston Oilers, Inc.* (Tex.Civ.App. 1974) 515 S.W.2d 725, 728-729). No case has been found applying state antitrust laws to the interstate activities of professional sports.

Professional football is a nationwide business structured essentially the same as baseball. Professional football's teams are dependent upon the league playing schedule for competitive play, just as in baseball. The necessity of a nationwide league structure for the benefit of both teams and players for effective competition is evident as is the need for a nationally uniform set of rules governing the league structure. Fragmentation of the

league structure on the basis of state lines would adversely affect the success of the competitive business enterprise, and differing state antitrust decisions if applied to the enterprise would likely compel all member teams to comply with the laws of the strictest state. (*Flood* v. *Kuhn, supra,* 443 F.2d at pp. 267-268.)

We are satisfied that national uniformity required in regulation of baseball and its reserve system is likewise required in the player-team-league relationships challenged by Partee and that the burden on interstate commerce outweighs the state interests in applying state antitrust laws to those relationships.

Partee seeks to distinguish *Flood* v. *Kuhn,* on the ground that professional baseball enjoys a unique exemption from federal antitrust law (*Flood* v. *Kuhn, supra,* 407 U.S. 258, 269-284 [32 L.Ed.2d 728, 736-745]; *Toolson* v. *New York Yankees* (1953) 346 U.S. 356 [98 L.Ed. 64, 74 S.Ct. 78]; *Federal Baseball Club* v. *National League* (1922) 259 U.S. 200 [66 L.Ed. 898, 42 S.Ct. 465, 26 A.L.R. 357]), and that the United States Supreme Court in upholding baseball's exemption from state law relied on the cases establishing baseball's federal exemption and stated that its holding applied to baseball. However, the high court specifically relied upon the court of appeals' statement: " '[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's system, the Commerce Clause precludes the application of state antitrust law.' " The high court also relied upon the district court judge's statement that "national 'uniformity [is required] in a regulation of baseball and its reserve system.' " (407 U.S. at p. 284 [32 L.Ed.2d at p. 745].) There is no justification to conclude that the United States Supreme Court did not fully consider the brief statements from the lower court opinions it chose to quote, approve, and rely upon. The statements are clear and unequivocal, and we are not free to disregard them. Because in all relevant respects the burden on interstate commerce and the state interest resulting from the player-team-league relationship in professional football attacked by Partee is substantially the equivalent of that resulting from the reserve clause in professional baseball, the statements are applicable to professional football.

Our conclusion that application of the Cartwright Act in the instant case would be in conflict with the commerce clause makes it unnecessary to consider the claim that application of the Cartwright Act would also be in conflict with federal labor law policy.[5]

---

[5]The dissent asserts that today's holding strikes a significant blow to the vitality of the Cartwright Act and that by this opinion "we would necessarily have to exempt all businesses engaged in multistate activities." (Dis. opn. at pp. 389, 408.) This opinion has a limited scope. The Cartwright Act remains vital. We do not mean to suggest that multistate activities

The judgment is reversed insofar as it awards damages on the basis of violation of the Cartwright Act. Each party shall bear its own costs on appeal.

Bird, C. J., Mosk, J., Richardson, J., Kaus, J., and Byrne, J.,* concurred.

**MOSK, J.,** Concurring.—I have signed the majority opinion, under compulsion of *Flood* v. *Kuhn* (1972) 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099].

Though keenly aware of the need to vigilantly enforce the Cartwright Act, I cannot accept the unique theory of the dissent that professional baseball and professional football are governed by different law. Though the playing fields are of different configuration, the balls of a different shape, the equipment and uniforms of a varying appearance and the method of scoring inconsistent, both baseball and football are for all practical purposes identical coast to coast sporting ventures seeking a combination of glory and financial reward.

While I might not rhapsodize as effusively about baseball lore as did Justice Blackmun in *Flood* (*supra,* pp. 260-264 [32 L.Ed.2d pp. 732-734]), I am bound by the decision in that case and believe despite some dictum (*id.,* p. 283 [32 L.Ed.2d at p. 744]) that it must be applied equally to professional football. If a great outfielder like Curt Flood is barred by the United States Supreme Court from state antitrust protection, an outstanding gridiron performer like Dennis Partee must suffer the same fate.

**REYNOSO, J.,** Dissenting.—Is the application of our state antitrust law (Bus. & Prof. Code, § 16700 et seq.; the Cartwright Act) to professional football precluded by the presence of interstate commerce and concurrent Sherman Act jurisdiction? I think not.

The Cartwright Act parallels and is in harmony with the Sherman Antitrust Act. A conflict would arise only if compliance with both federal and state regulations were impossible (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210]) or if state regulation stood as an obstacle to achievement of congressional objectives (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 587, 61 S.Ct. 399]). Nothing in the case before us even remotely suggests that application of the Cartwright Act conflicts with or is hostile to federal

---

of other businesses may not be subject to state regulation upon due consideration of the commerce clause. Our holding is limited to the issue directly before us, the inapplicability of the Cartwright Act to professional football.

*Assigned by the Chairperson of the Judicial Council.

antitrust enforcement. To the contrary, federal courts have held the same National Football League (NFL) rules and practices challenged by Partee to be violative of the Sherman Act. Nor is there any interference with any congressionally declared, paramount national interest, notwithstanding the majority's implication that the league structure of professional sports entitles the individual team businesses to a state antitrust exemption not enjoyed by any other business engaged in interstate commerce.

As the majority correctly note, the doctrine of federal preemption under the supremacy clause[1] is not involved in this case, i.e., Congress has not occupied the field of antitrust regulation to the exclusion of the states. Our focus then is on the narrow issue of federal preclusion under the commerce clause.[2] The majority summarily conclude, without discussion, that application of the Cartwright Act to the NFL practices would virtually destroy "the player-team-league relationships challenged by Partee and that the burden on interstate commerce outweighs the state interests in applying state antitrust laws to those relationships." (*Ante,* at p. 385.) But we are not told why this is so when the trial court has done nothing more than remove restraints on free trade which have already been held violative of the federal act.[3] I respectfully suggest that the majority fail to explain why there is a potential for lack of uniformity and a consequent burden on interstate commerce, because, in the present case, there can be *no* showing whatsoever that the application of the Cartwright Act to the challenged NFL practices will have *any* adverse effects on the free flow of commerce across state lines. In holding otherwise—contrary to the record before us—the majority ignore the unique and limited factual circumstances in which this case arises. The trial judge found that this case is one of only four cases remaining from a 1977 settlement of a class action antitrust suit brought by NFL players against the league. Pursuant to the settlement agreement, the players covenanted not to sue; thus only players opting out of the settlement—e.g., Partee—can challenge the practices here in issue.

---

[1](U.S. Const., art. VI, cl. 2.)

[2]"The Congress shall have Power . . . To regulate Commerce . . . among the several States. . . ." (U.S. Const., art. I, § 8, cl. 3.) The Supreme Court has explained: "The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods . . . or of persons who have been kidnapped. . . . Second, protection of the instrumentalities of interstate commerce, as, for example, the destruction of an aircraft . . . or persons or things in commerce, as, for example, thefts from interstate shipments. . . . Third, those activities affecting commerce." (*Perez* v. *United States* (1971) 402 U.S. 146, 150 [28 L.Ed.2d 686, 690, 91 S.Ct. 1357].) We are here concerned with the third element of interstate commerce jurisdiction.

[3]"Consequently, it would be difficult to prove that a policy which removes privately instituted interferences, delays, interruptions, and inconveniences with interstate commerce, is itself a delay, interference, interruption, and inconvenience to interstate commerce when enforced at the local level by the States." (Flynn, Federalism and State Antitrust Regulation (1964) at p. 84.)

Thus, in the circumstances of this case, I cannot agree that application of state antitrust law will impose on interstate commerce an undue—indeed, any—burden which " 'is clearly excessive in relation to the putative local benefits.' " (*Ante,* at p. 385.) This action, involving a California resident and a California corporation, arises under an employment contract expressly providing for the application of California law. The trial court, recognizing that antitrust regulation is an area of overlapping state and federal concern, correctly concluded the process is one of accommodation and that, in the present circumstances, application of state law is proper and preferable. Indeed, the state antitrust action was the only one available to Partee. A majority of this court have now left him with no remedy though the challenged practices manifestly violate state and federal antitrust laws.

The majority reverse the judgment in this case on the ground that "we are not free to disregard" the Supreme Court's holding in *Flood* v. *Kuhn* (1972) 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099]. Finding *Flood* controlling, the majority think it unnecessary to decide whether state regulation of professional football actually conflicts with federal law or policy. As I shall explain, the *Flood* case, while binding on us, is in my view clearly distinguishable. I question the wisdom of deferring to a case which the high court candidly admits is an aberration in the law and a perpetuation of earlier, erroneously decided cases applicable only to professional baseball. More importantly, in *Flood,* state antitrust regulation would have inevitably resulted in conflict with federal law as baseball has historically been granted an exemption from federal antitrust regulation. In other contexts, the Supreme Court has consistently held that the mere potential of conflict with federal law is insufficient to preempt state regulation. Most recently, the high court has held that California's statutory provisions for the storage and disposal of nuclear waste are not preempted by, and do not conflict with federal law, notwithstanding Congress' passage of the Nuclear Waste Policy Act of 1982. (*Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Commission* (1983) — U.S. — [75 L.Ed.2d 752, 103 S.Ct. 1713].) I find it ironic that this court today holds that professional football—for which Congress has *not* declared a national uniform policy—is immune from state regulation.

The majority thus embrace the same dubious conclusion reached by the Court of Appeal below. Although we granted hearing to address this difficult federal preemption question—the resolution of which requires a delicate balancing of state and federal interests in this area of mutual concern—the majority simply conclude that we are presented with a nonissue as the result in this case is assertedly preordained by the Supreme Court's decision in *Flood.* My conclusion that this case is not controlled by *Flood* necessarily requires a more detailed analysis (and rejection) of the San Diego Chargers

federal preclusion claim than that of the majority decision, which—I respectfully suggest—is rendered without apparent recognition of the significant blow dealt to the vitality of the Cartwright Act.

As I shall explain, the majority's holding represents a dramatic and abrupt departure from this court's previous teachings and uniform application of the Cartwright Act to activities affecting interstate commerce. I would not turn my back on sound precedent unless there is something unique about professional football which compels a marked deviation from the normal course of our consistent holdings in this area. In my view, professional sports enterprises, despite our society's fascination with them, are no different, in any legally significant way, than any other business engaged in interstate commerce. Accordingly, I fear that today's decision comes dangerously close to eliminating concurrent state-federal antitrust enforcement as it may be read as relegating state jurisdiction to solely intrastate conduct and activities, a realm of competence already severely restricted by the vast expansion of federal interstate authority.

In short, the majority fail to reconcile principles of federalism with the reality of a national economy dominated by interstate commercial activity. My review of the case law in this area convinces me that our state's interest in regulating anticompetitive practices is paramount if the subject matter is not one which requires exclusive federal regulation in order to achieve uniformity vital to national interests. An extended discussion of the relevant decisional authority is necessary to show that the majority today fashion the unprecedented rule that a wholly speculative conflict between state and federal law, founded on mere supposition and inference unsupported by the factual record before us, is sufficient to compel a finding of federal preemption. This approach is completely at odds with, and seriously misapprehends the commerce clause preclusion doctrine carefully delineated in legion Supreme Court decisions. I would not follow this misguided path at the expense of our state's Cartwright Act. Instead, I would hold that, consistent with the commerce clause, the Cartwright Act may apply to activities which affect interstate commerce if, as in the present case, there is neither a conflict with federal law or policy nor imposition of a burden on interstate commerce. I therefore dissent.

*This case arises in a limited factual setting.*

Partee filed this action alleging, inter alia, breach of contract in that the San Diego Chargers (Chargers) failed to pay his 1976 salary, and violation of the Cartwright Act in that the Chargers' adherence to various NFL rules and practices damaged his business and property interests. The antitrust action concerns five operating rules (contained in the NFL constitution and

bylaws and incorporated by reference in the standard player contract) which, Partee alleged, imposed an unreasonable restraint on player transfer. Partee challenged these rules (the draft, option clause, Rozelle rule, tampering rule and one-man rule) as they existed in 1974.

These operating rules and practices have since been modified due in large part to several other actions against the NFL brought by players under federal antitrust laws. Three individual plaintiffs have prevailed on the merits of their challenge to these same rules. (*Smith* v. *Pro-Football* (D.D.C. 1976) 420 F.Supp. 738, revd. in part, affd. in part (D.C. Cir. 1976) 593 F.2d 1173; *Kapp* v. *National Football League* (N.D.Cal. 1974) 390 F.Supp. 73 (9th Cir. 1978) 586 F.2d 644, cert. den. 441 U.S. 907 [60 L.Ed.2d 375, 99 S.Ct. 1996]; *Mackey* v. *National Football League* (D.Minn. 1975) 407 F.Supp. 1000, affd. in part, revd. in part (8th Cir. 1976) 543 F.2d 606, petn. for cert. withdrawn (1977) 434 U.S. 801 [54 L.Ed.2d 59, 98 S.Ct. 28].) In *Kapp,* the district court granted summary judgment in favor of plaintiff, finding the draft, Rozelle rule, tampering rule and one man rule violative of the Sherman Act. The *Smith* court found the draft a "per se" restraint on trade; the circuit court affirmed on the "rule of reason" theory, but remanded for recomputation of damages. In *Mackey,* the circuit court affirmed a judgment that the Rozelle rule violated the Sherman Act; thereafter, the NFL's petition for writ of certiorari in the Supreme Court was withdrawn pursuant to the terms of a settlement agreement in *Alexander* v. *NFL* (D.Minn. 1977) 1977-2 Trade Cases (CCH) ¶ 61,730.

*Alexander* was a class action brought on behalf of all NFL players, during the same period that NFL management was attempting to negotiate a collective bargaining agreement with the NFL Players Association (NFLPA). In March 1977, the NFL and NFLPA agreed to a comprehensive settlement which included the adoption of a new collective bargaining agreement which was made retroactive to the expiration date of the prior agreement in 1974. (This agreement expired in 1982.) The 1977 collective bargaining agreement sought to stimulate player mobility and remedy the lack of competitive bidding by, for example, modifying the Rozelle rule, providing a team with a "right of first refusal" when a free agent negotiates with another team for his services, and requiring that compensation take the form of draft choices. (See, e.g., Comment, *Sport in Court: The Legality of Professional Football's System of Reserve and Compensation* (1980) 28 UCLA L.Rev. 252.) Thus, the 1977 agreement substantially modified the rules and practices challenged by Partee and may have obviated most of the problems with unreasonable trade practices. (Of course, we are here concerned only with the NFL's rules and practices in effect in 1974 and need not consider whether the terms of the 1977, or for that matter the 1982, collective bargaining agreement are still so restrictive as to violate antitrust laws, state or federal.)

The *Alexander* settlement also contained a covenant not to sue in antitrust by the class members. Partee, however, is not bound by the settlement agreement as he filed this action before the specified cut-off date and chose not to be a class member.[4] Thus, as earlier noted, he is one of a handful of players who is not precluded from challenging the NFL rules in force in 1974.

The present action proceeded to trial in 1979. After a nonjury trial, the court found in favor of Partee on the antitrust and breach of contract causes of action.[5] As to the antitrust cause of action, the trial court found that "[t]he facts of this case present no undue burden upon interstate commerce, nor is there any preemption of the field by the Sherman Act or other federal statutes or the Constitution. . . ." Based on the evidence and, alternatively, on the doctrine of collateral estoppel (in reliance on *Smith, Kapp,* and *Mackey*), the court found that all of the challenged rules, with the exception of the option clause, constituted an unreasonable restraint of trade in violation of the Cartwright Act. The court assessed actual damages under the antitrust cause of action in the amount of $34,500 (based on the difference between the World Football League offer and Partee's 1974 salary from the Chargers computed through 1976) and trebled that amount under the Cartwright Act for a total amount of $103,500. Damages under the breach of contract cause of action were assessed in the amount of $30,550.

The Chargers do not appeal from the breach of contract judgment as they assert claims of error only as to the antitrust judgment. The Chargers contend that the trial court lacked jurisdiction to apply the Cartwright Act to the interstate activities of professional football.

*The narrow issue before us involves federal preclusion under the commerce clause.*

As the majority observe, the Chargers *do not* base their argument against state antitrust regulation of their business activities on the traditional

---

[4]Pursuant to federal rules of procedure for class actions, a notice was sent to all class members, including Partee, concerning the potential settlement. The settlement notice contained the following statement: "Neither the covenant not to sue, nor the dismissal with prejudice of this action shall prevent any member of the plaintiff class who duly commenced an individual action . . . in any Federal *or State Court,* prior to March 4, 1977, from pursuing such action to its lawful conclusion through trial and appeal." (Italics added.)

[5]The court found in favor of the Chargers on fraud and unpaid wages causes of action.

preemption doctrine.[6] The Chargers do not claim a violation of the supremacy clause. Nor can they do so. The contention that the Sherman Act (15 U.S.C. § 1 et seq.) occupies the field of antitrust (so that state regulation of the field is preempted as conflicting with the declared or presumed intent of Congress) was persuasively rejected in the well-reasoned Court of Appeal opinion *R. E. Spriggs Co.* v. *Adolph Coors Co.* (1974) 37 Cal.App.3d 653 [112 Cal.Rptr. 585].

The court in *Coors* noted that the legislative history of the Sherman Act unequivocably evidences a congressional intent to supplement, not preempt, state antitrust enforcement.[7] Moreover, because the Cartwright Act was patterned after the Sherman Act, both laws have identical objectives and are harmonious with each other (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]); thus, decisions under the latter act are applicable in construing the former (*Mailand* v. *Burckle* (1978) 20 Cal.3d 367 [143 Cal.Rptr. 1, 572

---

[6]The traditional preemption doctrine focuses on congressional intent. Thus, state regulation is preempted if Congress expresses a clear intent to reserve a field exclusively within its jurisdiction (see, e.g., *Pennsylvania* v. *Nelson* (1956) 350 U.S. 497 [100 L.Ed. 640, 76 S.Ct. 477]; *Charleston & W.C. Railway* v. *Varnville Furniture Co.* (1915) 237 U.S. 597 [59 L.Ed. 1137, 35 S.Ct. 715]) or if such an intent can be inferred in a field dominated by pervasive federal regulation (see, e.g., *Garner* v. *Teamsters Union* (1953) 346 U.S. 485 [98 L.Ed. 228, 74 S.Ct. 161]; *Hines* v. *Davidowitz, supra,* 312 U.S. 52). Conversely, in the absence of congressional occupation of a field, a state may regulate the interstate aspects of an activity, even though the regulation has some effect on interstate commerce. (See, e.g., *Head* v. *New Mexico Board* (1936) 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759]; *Huron Cement Co.* v. *Detroit* (1960) 362 U.S. 440 [4 L.Ed.2d 852, 80 S.Ct. 813, 78 A.L.R.2d 1294].) However, even in this latter area, state laws which conflict with federal law may be preempted. (E.g., *California* v. *Zook* (1949) 336 U.S. 725 [93 L.Ed. 1005, 69 S.Ct. 841]; but see *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117 [57 L.Ed.2d 91, 98 S.Ct. 2207]; *Parker* v. *Brown* (1943) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307].)

[7]"The history of the Sherman Antitrust Act makes it clear that the Congress did not intend that the federal legislation preempt parallel state efforts to control unfair competitive practices. Before the enactment of the Sherman Act, some 21 states had legislation proscribing 'combinations in restraint of trade.' Thus, it was not by accident that Congress did not use language in its act that would expressly preclude state regulation though the activity possessed interstate qualities. Senator Sherman, in urging enactment of his bill, stated: 'This bill . . . has for its . . . object to invoke the aid of the courts of the United States to deal with the combinations . . . when they affect injuriously our foreign and interstate commerce . . . and in this way to supplement the enforcement of the established rules of the common and statute laws by the several states in dealing with combinations that affect injuriously the industrial liberty of the citizens of those states. It is to arm the federal courts within the limit of their constitutional power *that they may cooperate with the state courts* in checking, curbing and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States . . . .' (21 Cong. Rec. 2457 (1890).)" (*R. E. Spriggs Co.* v. *Coors, supra,* 37 Cal.App.3d at p. 660, original italics, fn. omitted.) Thus, the fact that federal antitrust enforcement has historically become the dominant force in the field does not in itself mean that state antitrust law is displaced or preempted by the Sherman Act which, as noted, was passed for the purpose of supplementing state antitrust enforcement by providing for more efficient regulation of anticompetitive interstate activities.

P.2d 1142]). The adoption and incorporation of federal precedent effectively precludes the possibility of conflicts.[8] In light of Supreme Court holdings that "mere coincidence" of state and federal regulation is not enough to preempt state law (see, e.g., *California* v. *Zook, supra,* 336 U.S. at pp. 731-733 [93 L.Ed. at pp. 1010-1011]), it cannot be seriously disputed, therefore, that state and federal laws may operate concurrently in the area of antitrust regulation. (See *Younger* v. *Jenson* (1980) 26 Cal.3d 397, 405 [161 Cal.Rptr. 905, 605 P.2d 813] ["Obviously there is an overlap between coverages of the Sherman Act . . . and state antitrust laws that prohibit substantially the same conduct, . . ."].) Federal preemption, then, is applicable in this case, if at all, because of the operation of commerce clause limitations on this concurrent state jurisdiction.[9]

The Chargers make clear that their position is grounded on commerce clause principles. Particularly, they contend that state regulation through the Cartwright Act is precluded by the commerce clause because the structure of professional football is (1) "exclusively interstate commerce," and (2) "uniquely interstate commerce." The distinction set forth by the Chargers is not without significance. The former characterization—exclusivity—goes to the *impact* of the activity on the state: does it have a sufficient local consequence or nexus with the state? The latter—uniqueness—relates more properly to the *nature* of the activity: is it an activity requiring national uniformity, the regulation of which imposes a burden on interstate commerce?

*The challenged activities in this case are not exclusively in interstate commerce.*

It is axiomatic that where an activity is exclusively in interstate commerce without intrastate aspects, the commerce clause precludes state regulation or interference with that activity. (*R. E. Spriggs Co.* v. *Coors Co., supra,* 37 Cal.App.3d at p. 657.) Of course, as a practical matter, all interstate commerce has intrastate effects, as it begins in one state and ends in another.

---

[8]Also relevant in this regard is the shared common law heritage of state and federal antitrust laws. (See Flynn, Federalism and State Antitrust Regulation, *supra,* at p. 90.) As this court stated in *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 44 [172 P.2d 867]: "The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. . . ." This policy is wholly in conformity with the purposes sought to be furthered by the Sherman Act. (See, e.g., *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514]; *Apex Hosiery Co.* v. *Leader* (1940) 310 U.S. 469 [84 L.Ed. 1311, 60 S.Ct. 982, 128 A.L.R. 1044].)

[9]Although some courts have employed supremacy clause preemption and commerce clause preclusion terminology interchangeably, it is apparent that preclusion has been treated as a species of preemption.

We are here concerned, however, with "exclusive" federal jurisdiction in the constitutional sense, i.e., the preclusion of state regulation of essentially interstate activity. The question, then, is whether the interstate activity has the requisite impact upon intrastate commerce to sanction state interference. It has been held that states may apply antitrust laws to interstate commerce only " 'when such commerce has significant local consequences.' "[10] (*Baker* v. *Walter Reade Theatres, Inc.* (1962) 37 Misc.2d 172, 173 [237 N.Y.S.2d 795].)

The Chargers assert that the employment practices challenged by Partee are solely interstate in character. It is emphasized that the challenged rules and practices were applied uniformly by all the teams in the NFL. Thus, the Chargers argue, Partee's antitrust injury was the product of nationwide conduct by all NFL teams. Yet, we are not here concerned with the uniform adherence to the challenged rules and practices by NFL teams in general; rather, we are concerned with the anticompetitive practices of one team, a California partnership, which caused injury to a California resident. Moreover, the rules which were found to be a restraint on trade were incorporated in a service contract which, by its terms, expressly provides for the application of California law. Manifestly, the activity in the present case has both interstate and intrastate aspects.

I therefore conclude that the Chargers' conduct in this case does not present too remote or insubstantial a nexus with intrastate commerce so as to preclude state antitrust jurisdiction. (See *State* v. *Allied Chemical & Dye Corporation* (1960) 9 Wis.2d 290 [101 N.W.2d 133].)[11] I am not persuaded that this case involves exclusively interstate commerce and that this state has no legitimate local interest in its adjudication. Because the Cartwright Act is "within the tradition of 'the usual police' powers of the state," the state retains the right to protect its residents from trade restraints. (*Alfred M. Lewis Inc.* v. *Warehousemen etc. Local No. 542* (1958) 163 Cal.App.2d 771, 790 [330 P.2d 53].) But may it do so when such restraints arise primarily from interstate activity? In other words, may state regulation affect

---

[10]Conversely, the reach of federal antitrust jurisdiction into intrastate activity, while generally expansive, is also limited by the requirement that the impact of the local conduct on interstate commerce be more than incidental. (See, e.g., *Sun Valley Disposal Co.* v. *Silver State Disposal Co.* (9th Cir. 1969) 420 F.2d 341 [garbage collection]; *Kallen* v. *Nexus Corp.* (N.D.Ill. 1973) 353 F.Supp. 33 [bar review courses].) The boundaries in this area, however, are elusive. The courts have disagreed as to what type of activities are "essentially local" and thus not subject to federal intervention. (Compare *United States* v. *Yellow Cab Co.* (1947) 332 U.S. 218, 230 [91 L.Ed. 2010, 2020, 67 S.Ct. 1560] with *Times-Picayne* v. *United States* (1953) 345 U.S. 594, 602, fn. 11 [97 L.Ed. 1277, 1286, 73 S.Ct. 872].)

[11]In *Allied Chemical, supra,* 101 N.W.2d 133, three out-of-state corporate defendants were charged with a price-fixing conspiracy under the Wisconsin antitrust law. Defendants had neither offices nor employees in the state; and prices were set nationwide. Nonetheless, the court found them within the purview of the Wisconsin law.

all interstate activity which has a significant local impact? Although there is a dearth of authority in the area of antitrust, in other contexts the Supreme Court has consistently held, "[e]ver since *Willson* v. *Black-Bird Creek Marsh Co.*, 2 Pet. 245, and *Cooley* v. *Board of Wardens*, 12 How. 299" that the commerce clause "does not exclude all state power of regulation" and that "there is a residium of power in the state to make laws governing matters of local concern which nevertheless . . . affect interstate commerce or even . . . regulate it." (*Southern Pacific Co.* v. *Arizona* (1944) 325 U.S. 761, 766-767 [89 L.Ed. 1915, 1923].)

*The Cartwright Act is applicable to interstate activities.*

The anticompetitive activity in the present case—being both interstate and intrastate in character—is in the penumbral zone of the antitrust jurisdictional continuum, i.e., subject to overlapping state and federal authority. As I have explained, there is no supremacy clause bar to concurrent state jurisdiction in this area. The inquiry, then, is whether, given the requisite local nexus, the state is precluded by the commerce clause from affecting interstate commerce in its regulation of restraints on trade. The Chargers contend that no California case has upheld state regulation of interstate conduct comparable to the national practices here at issue, and that Cartwright Act enforcement has been limited to activities wholly within California. They further argue that prior cases deal only with supremacy clause preemption and not commerce clause preclusion.[12] The Chargers mischaracterize our case law. California cases have held, despite the lack of an unambiguous Supreme Court directive, that the state may, consistent with the commerce clause, regulate restraints on trade which affect interstate commerce.

This court has recently stated that "[n]either the Sherman Act nor the federal prohibition of undue burdens on interstate commerce . . . prevents [the Cartwright Act] from reaching transactions that have interstate aspects,

---

[12]As previously noted, some cases do appear to discuss preclusion and preemption interchangeably. One example is *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542, supra,* 163 Cal.App.2d 771, which involved an agreement to restrict competition. The trial court had determined that the agreement "would have been in violation of the Cartwright Act if it involved 'local businesses not engaged in interstate commerce,' but that because appellant [Lewis] was engaged in interstate commerce, the laws of the United States apply." (*Id.,* at p. 783.) Lewis was "engaged in interstate business, operating grocery stores in many states." (*Id.,* at p. 775.) Thus, the issue of commerce clause preclusion was squarely raised. The Court of Appeal reversed, holding that the Sherman Act does not preempt the Cartwright Act since there is no conflict between the acts. The court also discussed commerce clause preclusion: it stated that, even assuming "that the activities in question are within the sphere of the commerce clause [,] . . . [t]he fact that Congress has acted to prevent restraints on trade in commerce, of itself, does not invalidate legislation by a state effecting the subtantially same result." (*Id.,* at p. 788.)

but significantly affect state interests." (*Younger* v. *Jensen, supra,* 26 Cal.3d 397, 405; citing *Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34; *R. E. Spriggs* v. *Coors Co., supra,* 37 Cal.App.3d 653.) Although the issue in *Younger* concerned the authority of the Attorney General to investigate into the existence of antitrust violations, this court's statement regarding preclusion reaffirmed prior cases which have held that our state may regulate anticompetitive activities that affect interstate commerce. *Speegle* and *Coors* inescapably support the conclusion that Cartwright Act enforcement is not limited to wholly intrastate activities.

*Coors* involved a Cartwright Act action alleging antitrust violations in the California beer distribution system of an out-of-state brewer. Although the Court of Appeal was primarily confronted with a preemption challenge, it explicitly recognized that any holding against federal exclusivity would affect interstate commerce; accordingly, it proceeded to discuss commerce clause preclusion. While acknowledging that only Coors' California distribution scheme was being challenged, the court correctly noted that as this state's regulation of the distribution scheme "would clearly affect Coors' overall methods of distribution which are in interstate commerce, interstate commerce is both involved and affected." (37 Cal.App.3d at p. 658, fn. 4.) It had earlier observed that "[t]here is no question but that at all times relevant to this case, Coors was engaged in interstate commerce." (*Id.,* at p. 656.) After concluding that neither the supremacy clause nor the Sherman Act preempted the Cartwright Act, the court "turn[ed] to the question of whether the nature of the regulated subject *requires* federal preeminence." (*Id.,* at p. 660, original italics.) The court answered this question in the negative by employing the balancing approach enunciated in *California* v. *Zook, supra,* 336 U.S. 725. "The approach has been to reconcile the relevant state and federal interests and to find that the states have a valid interest in regulating unfair competitive practices within their jurisdictions, and *that this power is not lost merely because the activity affects interstate commerce.*" (*Id.,* at p. 663, italics added.) Earlier, the *Coors* opinion had observed that there was no undue burden on interstate commerce "in that the Cartwright Act, . . . is complementary to the relevant provisions of the federal statutes and may be justified as a reasonable means of protecting a significant state interest, i.e., prevention of unfair competition." (*Id.,* at p. 659.)

Of significance is the *Coors* court's recognition that finding state preclusion whenever interstate commerce is involved would effectively destroy most state antitrust enforcement since, in light of the vastly increased domain of federal commerce clause authority, states would be relegated to a severely restricted realm of intrastate commerce. With the demise of the mechanical "dual sovereignty" theory and the development of expansive

federal power over activities merely "affecting" interstate commerce (see, e.g., *Manderille Farms* v. *Sugar Co.* (1948) 334 U.S. 219 [92 L.Ed. 1328, 68 S.Ct. 996]; *United States* v. *Frankfort Distilleries* (1945) 324 U.S. 293, 298 [89 L.Ed. 951, 956, 65 S.Ct. 661] ["Congress in passing the Sherman Act, left no area of its constitutional power unoccupied"]), the regulatory power of the national government has become so broad that, if fully exercised, virtually all intrastate activity might be regulated to the complete exclusion of state authority (see, e.g., *Perez* v. *United States* (1971) 402 U.S. 146 [28 L.Ed.2d 686, 91 S.Ct. 1357] [loan sharking]; *Atlanta Motel* v. *United States* (1964) 379 U.S. 241 [13 L.Ed.2d 258, 85 S.Ct. 348] [public accommodations]). Recognizing the potential for "nullification of much state effort in the antitrust field[,]" the Court of Appeal aptly observed: "If state regulations were to lose effectiveness as soon as interstate commerce is affected, a large policing area would be excluded, and the states would become helpless to protect [their] citizens, though no national benefit would accrue. (*Commonwealth* v. *McHugh,* 326 Mass. 249 [93 N.E.2d 751, 761-764].) Exclusion would necessarily result whenever the subject activity 'substantially affects' interstate commerce."[13] (37 Cal. App.3d at p. 660; citing *Burke* v. *Ford* (1967) 389 U.S. 320 [19 L.Ed.2d 554, 88 S.Ct. 443].) Similarly, a federal court has recently noted that "[d]espite the broad reach of the federal commerce power, state antitrust laws retain vitality in dealing with matters which, while having interstate aspects, significantly affect local interests." (*Salveson* v. *Western States Bankcard Ass'n.* (N.D.Cal. 1981) 525 F.Supp. 556, 573-574.)

An earlier decision by this court, *Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, further supports the view that the state is not precluded from regulating interstate activity once a local nexus is established. The issue before this court was whether the application of the Cartwright Act to the insurance business was precluded in light of a then-recent Supreme Court decision holding that insurance transactions were interstate commerce. (*U.S.* v. *Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1142].) For three-quarters of a century prior to *South-Eastern,* insurance had been regulated by the states, as this business had been held

---

[13]*McHugh,* the Massachusetts case cited by the Court of Appeal, makes the following pertinent observations in arguing against a restricted role for state antitrust regulation: "Monopolies and restraints of trade are of infinite form and variety. . . . Some expend their efforts almost wholly upon intrastate commerce and are of only local interest and some almost wholly upon interstate commerce and so become matters of national concern, and there are all graduations in between. In many cases it would be very difficult to draw the line. If State laws have no force as soon as interstate commerce begins to be affected, a very large area will be fenced off in which the States will be practically helpless to protect their citizens without, so far as we can perceive, any corresponding contribution to the national welfare . . . . Especially is this true in view of the immense broadening in the conception of interstate commerce in recent years." (326 Mass. at p. 265.)

not to constitute interstate commerce. (*Paul* v. *Virginia* (1869) 75 U.S. (8 Wall.) 168 [19 L.Ed. 357].) However, the Supreme Court strongly suggested that the redefinition of insurance as interstate activity did not necessarily deprive state courts of jurisdiction to regulate this business,[14] and, accordingly, the court set forth a balancing test to decide the preclusion question: ". . . [T]he primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated. And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid. . . ." (*South-Eastern, supra,* at pp. 548-549 [88 L.Ed. at pp. 1454-1455].)

Relying on the above-quoted language, this court held in *Speegle* that since there is no conflict between the Cartwright Act and the Sherman Act, state law applies "even if interstate commerce is involved." (29 Cal.2d at p. 51.) *Speegle* stated: " 'State laws are not invalid under the Commerce Clause unless they actually discriminate against interstate commerce or conflict with a regulation enacted by Congress.' " (*Id.*, at p. 50.) (The *Speegle* court, however, omitted mention of the additional limitation—enunciated in Supreme Court cases dealing with state regulations outside the antitrust context—that the state may not impose an undue burden on interstate commerce—see, e.g., *Pike* v. *Bruce Church Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178-179, 90 S.Ct. 844]; *Bibb* v. *Navajo Freight Lines* (1959) 359 U.S. 520 [3 L.Ed.2d 1003, 79 S.Ct. 962].)

The foregoing demonstrates that the courts of this state have held, consistent with Supreme Court authority,[15] that the state may regulate interstate

---

[14]The final paragraph of the opinion states: "The argument that the Sherman Act necessarily invalidates many state laws regulating insurance we regard as [greatly] exaggerated." (322 U.S. at p. 562 [88 L.Ed. at p. 1462].) In response to *South-Eastern,* Congress enacted the McCarran-Ferguson Act which provides that federal law is only "applicable to the business of insurance to the extent that such business is not regulated by state law." ((1945) 59 Stat. 33, 15 U.S.C. §§ 1011, 1012.)

[15]While *Speegle* relied on an antitrust case (*South-Eastern, supra*), *Coors* necessarily relied on commerce clause decisions outside the field of antitrust because the Supreme Court, to my knowledge, has never specifically addressed itself to the question of the outer limit of state antitrust regulation of interstate commerce. Nevertheless, in every case I have found that raised the question factually, the high court has expressed a willingness to defer to state regulation. (See *Waters-Pierce Oil Co.* v. *Texas* (No. 1) (1909) 212 U.S. 86 [53 L.Ed. 417, 29 S.Ct. 220]; *Standard Oil Co.* v. *Tennessee* (1910) 217 U.S. 413 [54 L.Ed. 817, 30 S.Ct. 543]; *Straus* v. *Am. Publishers' Ass'n.* (1913) 231 U.S. 222 [58 L.Ed. 192, 34 S.Ct. 84]; cf. *Gibbs* v. *Buick* (1939) 307 U.S. 66, 83 [83 L.Ed. 1111, 1121, 59 S.Ct. 725] [Black, J., dis.]; see also *U.S.* v. *Underwriters Assn., supra,* 322 U.S. 533.) The early cases are of

anticompetitive activity subject to certain limitations. These limitations may be summarized as a three-part test of commerce clause preclusion: states may regulate interstate activity unless (1) the activity is exclusively in interstate commerce without intrastate aspects or a local nexus (*Coors, supra,* 37 Cal.App.3d 653); or (2) regulation of the activity imposes an undue burden upon or discriminates against interstate commerce (*Bruce Church, supra,* 397 U.S. 137; *Bibb, supra,* 359 U.S. 520); or (3) regulation of the activity conflicts with federal law or policy (*Speegle, supra,* 29 Cal.2d 34; *South-Eastern, supra,* 322 U.S. 533).[16]

I have thus far concluded that the anticompetitive conduct before us has significant intrastate aspects and is not exclusively in interstate commerce, and that the state may, consistent with the commerce clause, regulate restraints on trade which affect interstate conduct. The remaining inquiries focus on the second and third part of the test, and specifically, on the central issue before us in this case: whether state regulation of professional football burdens interstate commerce or conflicts with federal law or policy. We must "undertake[ ] a balancing approach in resolving these issues." (*Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178]; see also *Huron Cement Co.* v. *Detroit, supra,* 362 U.S. 440; *Southern Pacific Co.* v. *Arizona, supra,* 325 U.S. 761.) The majority, however, do not engage in the impartial balancing of conflicting interests mandated in a host of Supreme Court decisions; instead they accept the Chargers' contention that Supreme Court authority compels this court to hold that state regulation of all professional sports is prohibited by the commerce clause.

---

limited precedential value, however, since they only implicitly approved the application of state antitrust law, and also because these decisions were rendered in the era of strict adherence to the mechanical intrastate-interstate view of the commerce clause. It appears that in these early cases the court perceived the activity in question as purely intrastate in nature. As an example, see *Standard Oil*'s rejection of a contention that the Tennessee antitrust law constituted "an unreasonable constitutional interference with commerce among the States." (217 U.S. at p. 419 [54 L.Ed. at p. 820].) Justice Holmes responded: "The mere fact that [the Tennessee act] may happen to remove an interference with commerce among the States as well with the rest does not invalidate it. It hardly would be an answer to an indictment for forgery that the instrument forged was a foreign bill of lading, or for assault and battery that the person assaulted was engaged in peddling goods from another State. How far Congress could deal with such cases we need not consider, but certainly *there is nothing in the present state of the law at least that excludes the States from a familiar exercise of their power.*" (*Id.,* at p. 422 [54 L.Ed. at p. 821], italics added.)

[16]I note that commentators are "overwhelmingly supportive of the extension of state antitrust regulation to include conduct and practices that, while possessing a local nexus, nonetheless 'affect' or are 'in' interstate commerce." (Rubin, *Rethinking State Antitrust Enforcement* (1974) 26 U.Fla.L.Rev, 653, 670; see also Flynn, Federalism and State Antitrust Regulation, *supra,* at pp. 56-108; Mosk, *State Antitrust Enforcement* (1962) 21 A.B.A., Antitrust Section 358; Note, *The Commerce Clause and State Antitrust Enforcement* (1961) 61 Colum.L.Rev. 1469.)

*Flood v. Kuhn does not control this case.*

The Chargers, relying on *Flood* v. *Kuhn* (S.D.N.Y. 1970) 316 F.Supp. 271, affirmed (2d Cir. 1971) 443 F.2d 264, affirmed (1972) 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099]—a baseball case—contend that because professional sports require national uniformity in their regulation, they can only be regulated, if at all, under the Sherman Act. The majority agree with the Chargers that we are precluded from applying the balancing test because, assertedly, we are bound by the Supreme Court's decision in *Flood.* As earlier noted, I conclude that the Supreme Court's cursory holding in *Flood* with respect to state antitrust preclusion is limited to baseball—"a derelict in the stream of the law." (*Flood, supra,* 407 U.S. at p. 286 [32 L.Ed.2d at p. 746] [Douglas, J., dis.].) While a few lower courts, state and federal, have considered this difficult question, there is to my knowledge no Supreme Court opinion which sets forth guidelines as to the exact parameters of state antitrust regulation of interstate commerce. (See fn. 15, *ante.*) Finding no certain precedent to guide us, I would employ the balancing test enunciated in cases involving the interface of commerce clause requirements within other areas of state regulation.

In *Flood,* a baseball player challenged professional baseball's reserve system as violative of the Sherman Act and New York's antitrust law. The *Flood* litigation, however, was principally an assault on baseball's long-standing exemption from antitrust laws. In 1922, Justice Holmes, speaking for a unanimous court, ruled that baseball exhibitions were purely state affairs (to which the interstate transportation of players was merely incidental) and were not "trade or commerce in the commonly accepted use of those words" and hence "were not interference with commerce among the States." (*Federal Baseball Club* v. *National League* (1922) 259 U.S. 200, 209 [66 L.Ed. 898, 900, 42 S.Ct. 465, 26 A.L.R. 357].) Over the years, baseball was able to withstand intermittent antitrust attacks on the authority of *Federal Baseball.* The baseball exemption question again reached the Supreme Court in 1953, at a time when that court's decisions had greatly expanded federal commerce clause authority. In *Toolson* v. *New York Yankees* (1953) 346 U.S. 356 [98 L.Ed. 64, 74 S.Ct. 78], the court, with two justices dissenting, declined to reconsider *Federal Baseball* despite the considerable change during the intervening thirty years in the definition of "interstate commerce." The court referred to four reasons for its holding: (1) Congressional awareness of and inaction with respect to *Federal Baseball*; (2) baseball's development on the understanding that it was not subject to existing federal antitrust laws; (3) a reluctance to overrule *Federal Baseball* with a consequent retroactive effect; and (4) a professed desire that any remedy be supplied by Congress rather than by court decision. (346 U.S. at p. 357 [98 L.Ed. at p. 68].)

Four years after *Toolson,* the Supreme Court limited the exemption to the sport of baseball, and held that antitrust laws were applicable to professional football and its practices. (*Radovich* v. *National Football League* (1957) 352 U.S. 445 [1 L.Ed.2d 456, 77 S.Ct. 390].) Other decisions made it clear that *Toolson* applied only to baseball and that no other sport enjoyed exemption from the antitrust laws.[17] (See, e.g., *U.S.* v. *International Boxing Club* (1955) 348 U.S. 236 [99 L.Ed. 290, 75 S.Ct. 259]; *Haywood* v. *National Basketball Assn.* (1971) 401 U.S. 1204 [28 L.Ed.2d 206, 91 S.Ct. 672].)

Faced with this history, it is not surprising that Flood was not to prevail in his federal antitrust claim. The district court considered itself bound by the rule of stare decisis, stating that " 'decisions of the Supreme Court are not lightly overruled, . . .' " (*Flood, supra,* 316 F.Supp. at p. 277.) Further, the court held that in light of baseball's exemption from federal antitrust laws, state antitrust regulation would violate the supremacy and commerce clauses. The circuit court affirmed. However, it considered the state law claim a "question of first impression, . . . whether application of state antitrust law to professional baseball is barred by a federal pre-emption of the field under the Commerce Clause." (*Flood, supra,* 443 F.2d at p. 267.) Citing *Southern Pacific Co.* v. *Arizona, supra,* 325 U.S. 761, 774-775 [89 L.Ed. 1915, 1927-1928], the court of appeals said: "[W]here the nature of an enterprise is such that differing state regulation, although not conflicting, requires the enterprise to comply with the strictest standard of several states in order to continue an interstate business extending over many states, the extraterritorial effect which the application of a particular state law would exact constitutes, absent a strong state interest, an impermissible burden on interstate commerce." (*Ibid.*) It thus held that the commerce clause precluded state regulation of baseball.

On petition for certiorari, the Supreme Court principally considered the baseball exemption question. Justice Blackmun's opinion conceded that the baseball exemption was aberrant in view of the court's failure to similarly exempt other sports: "[B]aseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball. Even though others might regard this as 'unrealistic,

---

[17]The lower courts accepted this inconsistent result, but they did so reluctantly. One circuit court stated: "We freely acknowledge our belief that *Federal Baseball* was not one of Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.' [Citation.] . . . However, . . . we continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions . . . ." (*Salerno* v. *American League of Prof. Baseball Clubs* (2d Cir. 1970) 429 F.2d 1003, quoting *Radovich* v. *National Football League, supra,* 352 U.S. at p. 452 [1 L.Ed.2d at p. 461].)

inconsistent, or illogical,' see *Radovich, [supra],* the aberration is an established one, and . . . is an aberration that has been with us now for half a century, . . . If there is any inconsistency or illogic in all this, it is an inconsistency and illogic of long standing that is to be remedied by the Congress and not by this Court." (407 U.S. at pp. 282-284 [32 L.Ed.2d at pp. 743-744].) The court therefore concluded that Congress, "by its positive inaction," had sanctioned this anomaly and had "clearly evinced a desire" to keep baseball unregulated by federal antitrust laws. (*Id.,* at pp. 283-284 [32 L.Ed.2d at p. 744].)

The court then disposed of the state antitrust issue in a terse concluding paragraph: "The petitioner's argument as to the application of state antitrust laws deserves a word. Judge Cooper rejected the state law claims because state antitrust regulation would conflict with federal policy and because national 'uniformity [is required] in any regulation of baseball and its reserve system' 316 F.Supp., at 280. The Court of Appeals, in affirming, stated, '[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law' 443 F. 2d, at p. 268. *As applied to organized baseball,* and in the light of this Court's observation and holdings in *Federal Baseball* and *Toolson,* in *[United States* v.] *Shubert* [(1955) 348 U.S. 222 (99 L.Ed. 279, 75 S.Ct. 277)], in *International Boxing,* and in *Radovich,* and despite baseball's allegedly inconsistent position taken in the past with respect to the application of state law, these statements adequately dispose of the state law claims." (407 U.S. at pp. 284-285 [32 L.Ed.2d at p. 745], fn. omitted, italics added.)

While it is unfortunate that the court did not find it necessary to explain its reasons for affirming, the brief paragraph is nonetheless a constitutional holding rejecting Flood's alternate contention. Accordingly, we are bound by it. The court makes clear, however, that it agreed with the judgment below "[a]s applied to . . . baseball . . . ." As the New Mexico Supreme Court recently noted in rejecting a contention that *Flood* mandates preclusion of state antitrust laws: "In affirming the lower courts' decisions, the Supreme Court did not adopt any broad or rigid limitations on the applicability of state antitrust laws to transactions involving interstate commerce. The Court upheld those holdings '[a]s applied to organized baseball, and in light of this Court's holdings in *Federal Baseball* [and] *Toolson.* . . .' " (*United Nuclear Corp.* v. *General Atomic Co.* (1980) 96 N.M. 155 [629 P.2d 231, 273], quoting *Flood, supra,* 407 U.S. at p. 284 [32 L.Ed.2d at p. 744].)

The Chargers argue that we can infer from the citation to *Radovich,* a football case, that the court intended its holding to apply to football as well.

*Radovich,* however, held only that *Toolson* is specifically limited to baseball and that "the volume of interstate business involved in organized professional football places it within the provisions of the [Clayton] Act." (352 U.S. at p. 452.) As I have explained, the mere fact that a defendant is engaged in interstate activities does not preclude application of state antitrust laws. More likely, the court cited *Radovich* and the other sports cases to emphasize the unique and anomalous treatment afforded baseball. While I agree with the majority that the organizational structure of football is factually indistinguishable from that of baseball, the long-standing, aberrant exemption provided baseball makes this case readily distinguishable from *Flood.*

The unique character of the baseball exemption provides a clear explanation for the Supreme Court's affirmance of the district court's supremacy rationale for preempting state regulation of baseball. Having concluded that the "positive inaction" of Congress serves to exempt baseball from federal antitrust regulation (407 U.S. at p. 283 [32 L.Ed.2d at p. 744]), the court found it necessary to imply federal preemption of state antitrust enforcement as well. (See *Bay Guardian Company* v. *Chronicle Publishing Company* (N.D.Cal. 1972) 344 F.Supp. 1155, 1160 [statutory exemption for joint operating agreements preempts state antitrust law].) Indeed, "the time honored, though unusual, exemption from federal antitrust laws which professional baseball enjoys would be meaningless if state antitrust laws were not also inapplicable." (*United Nuclear Corp.,* 629 P.2d at p. 273.) Thus, in *Flood* there was a clear conflict since the application of state antitrust laws would produce a result inconsistent with the congressional intent that baseball be unregulated.

The Supreme Court's alternate holding[18] in *Flood*—affirming the circuit court's burden-on-commerce holding—also appears to be grounded on baseball's unique exemption, again, as suggested by the citation to *Federal Baseball* and *Toolson.* The high court specifically approved the view of the circuit court that "the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, . . ." (407 U.S. at p. 284 [32 L.Ed.2d at p. 745]; quoting 443 F.2d at p. 268.) The circuit court,

---

[18]I note that the preemption holding alone is sufficient to dispose of the *Flood* case. If state antitrust regulation is completely preempted by the supremacy clause there is no need to weigh the state's interest in regulating the activity against the burden imposed upon interstate commerce. Under a commerce clause analysis, state interference is presumed valid unless it unduly burdens commerce; therefore, such analysis must be preceded by a judicial determination (or litigant's concession) that state law is *not* preempted by the supremacy clause. In *Flood,* the circuit court did not discuss supremacy clause preemption; nor did it comment on the district court's preemption holding. It might be argued, therefore, that the high court's affirmance of the district court rendered the circuit court's commerce-clause-preclusion holding dictum, or that the court's affirmance of the circuit court is itself dictum.

relying on *Southern Pacific Co.* v. *Arizona, supra,* 325 U.S. 761, had reasoned that "if state regulation were permissible, the internal structure of the [baseball] leagues would require compliance with the strictest state antitrust standard." (443 F.2d at p. 268.)

The Chargers place heavy reliance on *Southern Pacific,* a case in which the Supreme Court precluded application of an Arizona law requiring a change in the length of trains at the state line. The trial court had found that "the Arizona Law had no reasonable relation to safety, . . ." (325 U.S. at p. 775 [25 L.Ed.2d at p. 1928].) Balanced against this, the court held that the "Arizona Train Limit Law imposes a serious burden on interstate commerce, . . . [as] [i]t materially impedes the movement of appellant's interstate trains through that state and interposes substantial obstruction to the *national policy proclaimed by Congress,* to promote adequate, economical and efficient railway transportation service. Interstate Commerce Act, preceding § 1, 54 Stat. 899." (*Id.,* at p. 773 [25 L.Ed.2d 1927], italics added.)

It seems evident that the circuit court in *Flood* quite properly relied on *Southern Pacific* because, as in the case of train regulation, there is, according to the Supreme Court, a "national policy" as to baseball. With respect to railroads and other interstate transportation, the needs of the subject matter clearly call for national uniformity. (See *Railroad Trainmen* v. *Terminal Co.* (1969) 394 U.S. 369 [22 L.Ed.2d 344, 89 S.Ct. 1109]; *Bibb* v. *Navajo Freight Lines, supra,* 359 U.S. 520.) Similarly, professional baseball is entitled to uniform treatment as Congress has "clearly evinced a desire" for a policy of self-regulation and complete antitrust exemption for this particular sport. (*Flood, supra,* 407 U.S. at p. 284 [32 L.Ed.2d at p. 744].) State regulation of baseball would result in inherent conflict because states, unguided by federal antitrust precedent, would subject baseball to antitrust laws of varying strictness in violation of the commerce clause.

While the impact of diverse state regulation is unquestionable as to baseball, professional football, by marked contrast, can claim only a potential conflict in the absence of a corresponding "national policy" precluding federal antitrust regulation. Unlike baseball, football cannot claim a national policy supporting self-regulation. Nor is football "a subject demanding exclusive federal regulation in order to achieve uniformity vital to national interests."[19] (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. 132, 144

---

[19]The Supreme Court has sustained preemption challenges against state law in most cases where the "national interest" implicated is in the area of national security or labor policy, neither of which is in issue here. (See, e.g., *Hines* v. *Davidowitz, supra,* 312 U.S. 52; *Pennsylvania* v. *Nelson* (1956) 350 U.S. 497 [100 L.Ed. 640, 76 S.Ct. 477]; *Garner* v. *Teamsters Union* (1955) 346 U.S. 485 [98 L.Ed. 228, 74 S.Ct. 161]; *Hill* v. *Florida* (1945) 325 U.S. 538 [89 L.Ed. 1782, 65 S.Ct. 1373].)

[10 L.Ed.2d 248, 257]; see and compare *Southern Pacific, supra,* 325 U.S. 761, and *Navajo Freight Lines, supra,* 359 U.S. 520 with *Pacific Gas & Elect., supra,* — U.S. —, and *United Nuclear, supra,* 629 P.2d 231, 272 [uranium industry not "vital to military posture of United States" and subject to state antitrust laws].) Nor has Congress manifested the intent, express or implied, to exempt football from federal antitrust regulation so as to preclude divergent state enforcement.[20] To the contrary, the fact that football is subject to federal antitrust laws greatly reduces the potential for diverse treatment by states, like California, which have patterned their antitrust laws after the Sherman Act and have adopted federal precedent as their own. In fact, as I shall explain, the trial court judgment in the present case is consistent with federal authority holding the same rules and practices challenged here violative of the Sherman Act.

In sum, *Flood* and *Southern Pacific* are inapposite. The Chargers would have us assume a conflict between state and federal antitrust policies without assessing and weighing the perceived detrimental impact of state regulation on professional football against this state's strong interest in enforcing its antitrust laws. Although the mere potential of conflicting state regulation was held sufficient to impermissibly burden baseball by forcing it to conform to "the strictest state antitrust standard" (*Flood, supra,* 443 F.2d at p. 268), I interpret the *Flood* cases as limited to professional baseball because of their focus on the unique historic development of that sport.[21]

---

[20]Chief Justice Stone's statement in *Parker* v. *Brown, supra,* 317 U.S. at page 351 [87 L.Ed. at p. 326], is particularly apt in this regard: "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's [regulatory scheme] is not lightly to be attributed to Congress."

[21]I recognize of course that state and federal lower courts have held state antitrust laws inapplicable to various professional sports. (See *State* v. *Milwaukee Braves, Inc.* (1966) 31 Wis.2d 699, 719-732 [144 N.W.2d 1], cert. den. (1966) 385 U.S. 990 [17 L.Ed.2d 451, 87 S.Ct. 598]; *Matuszak* v. *Houston Oilers* (Tex.Civ.App. 1974) 515 S.W.2d 725; *Robertson* v. *National Basketball Association* (S.D.N.Y. 1975) 389 F.Supp. 867, 880-881; *HMC Management* v. *New Orleans Basketball Club* (La.App. 1979) 375 So.2d 700, 706, cert. den. (La. 1980) 379 So.2d 11.) These authorities, however, are not controlling.

In *Milwaukee Braves,* a pre-*Flood* case, Wisconsin brought an action against 10 baseball teams alleging that the league's decision to move the Braves' franchise to Atlanta violated its state antitrust law. In holding state law inapplicable, the majority opinion obliquely stated that "some members" of the court believed state law was preempted under the supremacy clause while "other members" preferred a commerce clause rationale. In either event, the court makes clear that its decision was grounded on baseball's unique "history of judicial action and legislative inaction" and the resulting "conflict between state and federal policy." (31 Wis.2d at p. 721.) Moreover, "transfer of a team franchise is certainly distinguishable (particularly with regard to the likelihood of state discrimination in favor of its own economic interests) from restraints imposed . . . upon players' freedom to negotiate, . . ." (*Flood, supra,* 316 F.Supp. 271, 279.)

Similarly, *HMC Management* involved an attempt to keep the "Jazz" basketball team from moving from New Orleans. Relying on *Flood,* the court held on preemption grounds that "most of the violations that are alleged cannot be subject to Louisiana Anti-Trust

Baseball is, to use the Supreme Court's own adjectives, "an exception and an anomaly." (*Flood, supra,* 407 U.S. at p. 282 [32 L.Ed.2d at p. 743].) I am not persuaded that this "aberration" (*ibid.*) should be extended to another professional sport. As in *Radovich,* the Chargers and amicus NFL seek refuge under a protective umbrella provided only to baseball. However, because football enjoys no congressional or judicially created exemption from antitrust laws, its asserted need for uniformity must be based, not on a national policy precluding state regulation, but, rather, only on the nature of its interstate operations. I would therefore balance this asserted need for uniformity against this state's interest in enforcing its antitrust laws in order to determine whether, "under the circumstances of [this] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz, supra,* 312 U.S. 52, 67 [85 L.Ed. 581, 587].)

*Under the facts of this case, state antitrust regulation of football neither burdens interstate commerce nor conflicts with federal law or policy.*

In cases where there is no express or implied national policy with respect to a particular business enterprise, the Supreme Court has phrased the "general rule" for determining the validity of state regulation affecting interstate commerce as follows: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes

---

Laws." (375 So.2d at p. 706.) The court held, however, that the alleged violation of a lease, if proven to be the result of anticompetitive conspiracy, would be subject to the state law. (*Id.,* at p. 707.) As I have explained, though, this court cannot, absent an unambiguous Supreme Court directive to the contrary, limit our state antitrust law to purely intrastate activities.

In *Matuszak,* a football case, the Texas court simply quoted the circuit court's opinion in *Flood* and concluded, on "federal pre-emption" grounds and without analysis, that the circuit court's "holding is applicable to the instant case . . . [t]herefore, the question of whether Matuszak's contract violates federal law is a question for the Federal Courts." (515 S.W.2d at pp. 728-729.)

Finally, in *Robertson* a federal district court found "the opinion of the Court of Appeals [in *Flood*] unquestionably applicable and controlling." (389 F.Supp. at p. 880.) The court held state antitrust regulation inapplicable to professional basketball because that sport is in the " 'same business' " as baseball, involving " 'substantial volumes of interstate . . . commerce.' " (*Id.,* at p. 881.).

To the extent that *HMC Management, Matuszak* and *Robertson* held (either without analysis or in reliance on the virtually identical league structures and interstate nature of professional sports) that state antitrust law is preempted or precluded, we should decline to follow these cases. In my view we should not decide the instant case on the basis of the organizational similarities between professional football and baseball; rather, we should focus on the aberrant treatment historically accorded the latter sport.

one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues [citation], but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. [Citation.]" (*Pike* v. *Bruce Church, Inc., supra,* 397 U.S. 137, 142 [25 L.Ed.2d 174, 178]; see also *Hughes* v. *Oklahoma* (1979) 441 U.S. 322, 336 [60 L.Ed.2d 250, 262, 99 S.Ct. 1727].) In applying this mode of analysis, I bear in mind that federal antitrust laws are applicable to professional football (*Radovich, supra,* 352 U.S. at p. 452 [1 L.Ed.2d at p. 461]), and that federal decisions under the Sherman Act are applicable in state antitrust cases brought under the Cartwright Act (*Mailand* v. *Burkle, supra,* 20 Cal.3d 367, 373.)

With respect to the requirement that the state law regulate "even-handedly," it is the rule that the burden to show discrimination rests on the party challenging the state regulation. (*Hughes* v. *Oklahoma, supra,* at p. 336 [60 L.Ed.2d at p. 262].) This question needs no extended discussion as the Chargers do not contend the Cartwright Act discriminates between interstate and intrastate commerce. Clearly, this state's antitrust law is nondiscriminating. Because the Cartwright Act applies both to interstate and intrastate commerce, "the controlling question is whether the incidental burden imposed on interstate commerce by [the state] is 'clearly excessive in relation to the putative local benefits.'" (*Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 472 [66 L.Ed.2d 659, 674, 101 S.Ct. 715], quoting from *Pike* v. *Bruce Church, Inc., supra,* 397 U.S. 137, 142 [25 L.Ed.2d 174, 178].) Though this is the central question before us, the majority do not balance California's interest in preventing unfair trade practices within its borders against the asserted burden on professional football's interstate operations and its need for nationally uniform antitrust regulation.

It is not open to dispute that California has a legitimate interest in protecting its citizens against unfair trade practices. Regulations which effectuate a legitimate public interest—here antitrust regulation under the Cartwright Act—are within the state's inherent police powers. (*Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542, supra,* 163 Cal.App.2d 771, 790.) It has been consistently held that "the prevention of anti-competitive, monopolistic and predatory trade practices . . . is a legitimate exercise of the state's inherent police powers." (*United Nuclear, supra,* 629 P.2d at p. 270; citing *Giboney* v. *Empire Storage Co.* (1949) 336 U.S. 490 [93 L.Ed. 834, 69 S.Ct. 684].)

The Chargers contend, though, that the state interest is outweighed because professional football is a unique activity of interstate commerce which

requires nationally uniform governance. The Chargers argue that the nationwide character of the NFL league structure and operating practices prohibits the application of state antitrust laws.

The Supreme Court has rejected a similar argument, advanced by oil companies, that the nationwide character of the industry prohibited state regulation. The court stated: "[W]e cannot adopt appellants' novel suggestion that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas. Appellants point out that . . . the cumulative effect of this sort of legislation may have serious implications for their national marketing operations. While this concern is a significant one, we do not find that the Commerce Clause, by its own force, pre-empts the field of retail gas marketing. . . . [T]his Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods. . . . In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of, interstate commerce, we cannot conclude that the States are without power to regulate in this area." (*Exxon Corp.* v. *Governor of Maryland, supra,* 437 U.S. 117, 128-129 [57 L.Ed.2d 91, 101-102].)

The *Exxon* analysis applies with equal force here. If we were to insulate football from this state's antitrust laws on the basis of its "national character," we would necessarily have to exempt all businesses engaged in multistate activities. The Chargers' arguments, carried to their logical extension, would severely restrict the applicability of the Cartwright Act since a large segment of this nation's businesses would be immunized from state antitrust regulation as soon as their activities became "national" in scope. Thus, "a very large area will be fenced off in which the states will be practically helpless to protect their citizens . . . ." (*Commonwealth* v. *McHugh, supra,* 326 Mass. 249, 265.)

The majority apparently accept the Chargers' argument that professional football is unique in that the league structure imposes a "necessary interdependence" among the teams, each of which is required to function pursuant to a uniform set of national rules. Thus, the Chargers argue, subjecting California teams to differing standards would adversely affect, and possibly result in the fragmentation of, the league structure of the NFL. This argument would be quite persuasive if these were the facts before us, but, because they are not, we cannot properly express any opinion as to the resolution of a hypothetical conflict. There is no showing whatsoever in the present case that the Chargers have been subjected to more stringent or inconsistent requirements under state law. (Cf. *Ray* v. *Atlantic Richfield Co.*

(1978) 435 U.S. 151, 165 [55 L.Ed.2d 179, 193, 98 S.Ct. 988] (preemption of state statute which undermined uniform federal standards by setting more stringent oil tanker design requirements).) To the contrary, the judgment below is entirely consistent with federal court decisions finding the same practices violative of the Sherman Act. As earlier noted, the trial court was aware of, and in fact relied in part on the federal decisions in *Smith* v. *Pro-Football, Inc., supra,* 593 F.2d 1173, *Kapp* v. *National Football League, supra,* 390 F.Supp. 73, and *Mackey* v. *National Football League, supra,* 543 F.2d 606. Thus, there is uniformity of treatment under both state and federal law. It certainly cannot be argued that state antitrust enforcement has in this case frustrated the purpose of the Sherman Act when the trial court, in complete harmony with its federal counterparts, has simply condemned anticompetitive practices that have already been condemned under federal law. Because both jurisdictions have sought to achieve the same result—elimination of trade restraints—there is no "showing of a specific . . . burdening of . . . interstate commerce." (*Exxon, supra,* at pp. 128-129 [57 L.Ed.2d at p. 102].) While professional football may indeed be entitled to uniform treatment, it has been provided it by the trial court.[22]

The Chargers fall back on one final argument: they contend that they need not show specific, actual conflict but only that *potential* conflict may arise after an initial state and then subsequent states impose their own differing regulations on the activity. I disagree. Numerous Supreme Court decisions have deferred to concurrent state and federal regulation where the record "contains nothing to suggest the existence of any . . . competing or conflicting local regulations" (*Huron Cement, supra,* 362 U.S. 440, at p. 448 [4 L.Ed.2d 852 at p. 859) or where the "record demonstrates no inevitable collision between the two schemes of regulation, despite the dissimilarity of standards." (*Florida Avocado, supra,* 373 U.S. 132, at p. 143 [10 L.Ed.2d 248 at p. 257].) Moreover, the limited scope of the present case militates against finding even a potential conflict. As noted earlier, the NFL rules and practices challenged by Partee have been substantially modified pursuant to the settlement in *Alexander.* There was evidence before the trial court that Partee was one of only four players who opted-out of the *Alexander* class and refused to covenant not to sue. Thus, there is potential for conflict *only* if a court in one of the remaining cases rules *in favor* of the NFL, and contrary to the present case and *Smith, Kapp,* and *Mackey.*

"Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does [state] regulation violate the Commerce Clause."

---

[22]I do not mean to suggest that under different factual circumstances state antitrust regulation may not unreasonably burden interstate commerce. Such a case, however, is not before us.

(*Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 474 [66 L.Ed.2d 659, 675, 101 S.Ct. 715].) On the record before us, I conclude there is no specific burdening of interstate commerce; nor is there a showing of actual or potential conflict in an area where uniformity of regulation is required pursuant to a congressional declaration of policy. "[W]here the effect of the application of the Cartwright Act upon interstate commerce is to facilitate competition and not to place a restraint upon it, it is one which conforms with like policies of the federal government . . . ." (*Coors, supra,* 37 Cal.App.3d at p. 666.)

In sum, the present case illustrates a successful accommodation of state and federal policies. I am simply unable to find that the stringent federal preclusion standard has been met in this case.[23] Yet, this court today relies on the Chargers' unwarranted and unproven speculations as to a purported irreconcilable undermining of federal law without requiring them to meet their burden of clearly demonstrating that the application of the Cartwright Act in this case inexorably conflicts with the purposes underlying the federal act. The reasoning process which leads the majority to conclude that a citizen of this state is without power to enforce our state's antitrust laws because of the mere existence of concurrent federal regulation of professional football is both legally and factually defective. Though it may be correctly said that the national operations of professional football require uniform antitrust regulation, this alone does not justify ignoring the "thoroughly established" principle that where Congress has not expressly prohibited regulation of a given field, state law "is superseded *only* where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" (*Kelly* v. *Washington* (1937) 302 U.S. 1, 10 [82 L.Ed. 3, 10-11, 58 S.Ct. 87], italics added.) Our primary inquiry, then, should be whether state antitrust enforcement in this case is so repugnant that it inevitably undermines the purpose of the Sherman Act. As I have explained, we simply have no basis for concluding that state regulation frustrates federal law or policy as nothing in the present record shows that this state has or will impose more stringent antitrust requirements.

Although, "[i]n the final analysis, there can be no crystal clear distinctly marked formula" (*Hines* v. *Davidowitz, supra,* 312 U.S. at p. 67 [85 L.Ed. at p. 587]), my review of the case law compels me to conclude—notwithstanding the aberrant *Flood* decision—that there is a heavy presumption against preemption where state regulation seeks to protect the vital interests

---

[23]"The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at p. 142 [10 L.Ed.2d at p. 257].)

of state citizens. By reversing the normal presumption against finding federal preemption, the majority ignore the fact that state enforcement here promotes the very policy goals underlying the enactment of the Sherman Act. Accordingly, under the factual circumstances before us, I cannot agree that the commerce clause precludes state antitrust regulation. I would hold that the trial court had jurisdiction to apply the Cartwright Act to professional football.

For the foregoing reasons I would affirm the judgment.

Respondent's petition for a rehearing was denied September 28, 1983, and the judgment was modified to read as printed above.